T.C. Memo. 2007-244


UNITED STATES TAX COURT


LEE B. ARBERG AND MELISSA A. QUINN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15376-05.              Filed August 27, 2007.


        Prior to 1999, a brokerage account at E Trade
Securities, Inc., was established in the name of P-W.
For 1999, P-W filed a separate return reporting capital
gain income from activity in the E Trade account.  For
2000, Ps contend that losses generated in the E Trade
account are entitled to ordinary income treatment by
reason of a business of P-H as a trader in securities
and that various expenses should be allowed as
deductions of the securities trading business and/or a
consulting business of P-H.

        <u>Held</u>:  Gains and losses in the E Trade account
must be attributed to P-W and are capital in nature.

        <u>Held</u>, <u>further</u>, Ps are not entitled to expense
deductions in excess of those allowed by R.

        <u>Held</u>, <u>further</u>, Ps are liable for the accuracy-
related penalty pursuant to sec. 6662, I.R.C., for
2000.

Roger D. Lorence, for petitioners.

Stephen R. Takeuchi, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  Respondent determined a Federal income tax deficiency for petitioners' 2000 taxable year in the amount of $167,221 and a penalty pursuant to section 6662(a) in the amount of $33,444.[1]  After concessions, the principal issues for decision are:

(1) Whether petitioners are entitled to report claimed gains and losses in ordinary income on account of an alleged business of petitioner Lee B. Arberg (Mr. Arberg) as a trader in securities within the meaning of section 475(f)(1);

(2) whether petitioners are entitled to deduct various business expenses claimed in connection with the securities trading and/or a consulting business of Mr. Arberg; and

(3) whether petitioners are liable for the section 6662(a) accuracy-related penalty for 2000.

Certain additional adjustments; e.g., to itemized deductions, are computational in nature and will be resolved by concessions made and our holdings on the foregoing issues.

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended and in effect for the year in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.[2]  At the time the petition was filed in this case, Mr. Arberg resided in Florida and petitioner Melissa A. Quinn (Ms. Quinn) resided in Georgia.

Employment and Trading Activities

Mr. Arberg was born in 1968 and graduated from Princeton University in 1990 with a major in history.  Upon graduation, he was employed by the Cummins Engine Company in Columbus, Indiana. He worked in the company's mergers and acquisitions division, focusing on financial and valuation analysis.  After approximately 2 years, Mr. Arberg went to work for Hemisphere Trading Company, an investment adviser based in Memphis,

---

[2] The parties filed a stipulation of facts and exhibits at the trial session in Jacksonville, Florida.  Both parties subsequently filed an opening brief including proposed findings of fact.  Respondent's proposed findings incorporated verbatim various of the stipulated facts, and petitioners included a number of consistent paraphrases.  On reply brief, petitioners' response to respondent's requested findings consists of the following:  "Petitioners object to Respondent's Requested Findings of Fact in their entirety and request that this Court adopt Petitioners' Requested Findings of Fact in their entirety." While the Court has taken the findings proposed in petitioners' opening brief into account in finding the facts set forth infra, the obvious overbreadth of their approach on reply brief complies with neither the letter nor the spirit of Rule 151(e)(3).  In effect, this severely truncated approach has deprived petitioners of the full extent of their opportunity to set forth an objection, as to each proposed finding of fact, afforded by the Rule.

Tennessee, and he remained there for roughly 5 years.  At Hemisphere Trading Company, Mr. Arberg was in charge of portfolio management trading, and his duties included both executing trades and supervising trades executed by other employees.

During the mid- to late-1990s, Mr. Arberg also served on the board of directors of the company SI Diamond Technology, Inc., and provided consulting services to the entity.  The consulting services were directed toward conducting a valuation relating to a proposed merger and acquisition transaction.  Mr. Arberg's compensation for that work consisted primarily of stock options, which Mr. Arberg apparently sold at a gain in the late 1990s.  Sporadic additional services may have been provided to SI Diamond Technology, Inc., or a successor entity in the early 2000s.

Following his work at Hemisphere Trading Company, Mr. Arberg's next principal employment was for Lasertron, a subsidiary of Oak Industries, Inc.  Lasertron was involved in the fiber optics and photonics business, and Mr. Arberg was engaged in 1999 to provide a valuation of that business, again with a view towards a potential merger or acquisition transaction.  The work culminated with the signing in November of 1999, and the closing in January of 2000, of an agreement for the sale of Oak Industries, Inc., and its Lasertron subsidiary to Corning, Inc., creating a division referred to as Corning Lasertron.  Mr. Arberg's work for Lasertron ended with the closing of the

sale.  He was compensated with salary and stock options, which options he exercised in early 2000.

Ms. Quinn was born in 1969 and graduated from the University of Delaware in 1987 with a major in economics.  She then went to work for Lehman Brothers, Inc., in New York City.  She was employed as an institutional trader, executing at the institutional desk trades of large blocks of stock for major accounts.  Mr. Arberg and Ms. Quinn met through her role as a "sell side" trader and his as a "buy side" client of Lehman Brothers, Inc., during his employment at Hemisphere Trading Company.  Ms. Quinn took a position as an institutional trader with Salomon Smith Barney, Inc., in Atlanta, Georgia, in 1997 or 1998.  Mr. Arberg and Ms. Quinn were married in Atlanta in May of 1998.

Mr. Arberg began buying and selling securities for his own account in 1992, and he continued that activity through at least 2000.  Petitioners testified that by 1998 Mr. Arberg had begun to invest in extensive computer and telecommunications equipment and access to specialized stock information services, such as those referred to as the Bloomberg and InstaNet systems.  Mr. Arberg concentrated his activities in industry sectors with which he had experience, particularly those involving telecommunications and fiber optics.  He described his strategy as follows:

> A    I would, without a doubt, consider myself a position trader, where you're taking the position

versus someone who is trying to trade for TICS [ticks?]. When I say TICS, I mean, if a stock is trading at 10 1/8, a TIC trader would buy a [sic] 10 and try to sell it at 10 1/4, make 25 cents, and say, thank you and goodbye. I mean, that's something that I felt I was ever [sic] good at. I understand the fundamentals of a company. So I did position trading. You know, position trading is probably 60 to 70 percent of the trading done on Wall Street.

Q    What was the average length of time that you held each position?

A    Well, the average length of time can't be predetermined. Whereas a TIC trader would say, Okay, I'm buying at 10, as soon as it hits 10-1/4, I'm out and gone; and if it trades at 9-7/8, I'm out, because you're playing for the TICs. A position trader would say that this, and relative to other groups on my spreadsheet, it's undervalued or overvalued. Because it's undervalued, it should at least migrate towards the mean. That's what I'm trying to wait for. I don't know how long that migration may be. At the same time, you've got to be careful of your losses.

I mean, I can't say, you know what, it's 20 percent undervalued, but this is the way we were paying our mortgage payments. So I can think all day long that it's 20 percent undervalued , but if it goes to 50 percent undervalued, we'd be mowing lawns.

Q    The original 1040 for 2000 doesn't show any long term gain or loss. Did you ever hold any positions in 1998 for long term gain or loss?

*    *    *    *    *    *    *

A    Not on purpose. When I say, not on purpose, that would not be the reason. It would happen because I would have a spreadsheet of names, and on those names, I'd find something that was 20 to 30 percent undervalued. If it's creeping up and it's now 10 percent undervalued compared to the group, there's no necessary reason for me to sell it just to sell it. I'd sell it just because it went above that median valuation.

Q    In 1999?

A   It would be the same situation.

Q   In 2000?

A   It would be the same situation.

By 1998, Mr. Arberg was conducting securities trades through accounts held in his name at Charles Schwab and/or Salomon Smith Barney.  At some point during 1998 or 1999 not clear from the record, a brokerage account in the name of Ms. Quinn was opened at E Trade Securities, Inc.  Because of employee trading restrictions imposed as a result of her position with Salomon Smith Barney, Ms. Quinn was required to, and did, obtain the permission of her superior to establish the E Trade account.  According to petitioners, a principal source of funding for the E Trade account was compensation Mr. Arberg received from his consulting work.

Tax Reporting

Petitioners filed separate Federal income tax returns for 1998 and 1999.  They then filed a joint Form 1040, U.S. Individual Income Tax Return, for 2000.  For 1998, Mr. Arberg reported wage income of $76,766 and included with his return a Schedule C, Profit or Loss From Business, for a business characterized as "Mark to Market Trading".[3]  The Schedule C

---

[3] The complete copy of Mr. Arberg's Form 1040 for 1998 in the record is an unsigned copy provided by petitioners to the Internal Revenue Service (IRS) during the examination of Mr. Arberg's 1999 return, addressed infra.  The return was
(continued...)

reflected gross income of $49,777, expenses of $176,452, and a resultant net loss of $126,675. The expenses comprised mortgage interest of $5,799, office expenses of $3,240, travel of $6,147, meals and entertainment of $1,421, utilities of $3,987, and other expenses of $155,858. The other expenses were explained as follows:

> Tax payer elects to be a mark to market trader.
> Code Section 475 (f) (1) (A)
> Losses on mark to market trades and holdings at year end-see attached schedule.

The attached schedule listed 17 securities lots, each with a date acquired and date sold between January 7 and September 18, 1998, and reflected a net loss on the transactions of $155,858.29. Appended below the listing was the statement: "As of 12/31/98, there were no open positions to mark to market." The transactions were conducted through the account held in Mr. Arberg's name at Charles Schwab. A Schedule D, Capital Gains and Losses, was also attached to the return and repeated in an annotation that "Tax Payer elects to be a mark to market trader under code section 475 (f)(1)(A)".

---

[3](...continued)
introduced by respondent at trial and was admitted into evidence. The parties also included amongst the stipulated exhibits a copy of a Schedule C characterized in the attendant stipulation as having been attached to the 1998 return. The Court is satisfied, given the discussions at trial and particularly in light of fact that the Schedule C attached to the unsigned return is identical to the stipulated copy, that the unsigned copy of the complete 1998 return is an accurate representation of the return filed by Mr. Arberg for that year.

For 1999, Mr. Arberg again filed a separate return showing wage income ($84,114 (rounded) from Lasertron) and also attaching a Schedule C for a "MARK TO MARKET TRADING" business. The Schedule C reported gross income of zero, expenses of $34,779 (comprising $2,790 for car and truck expenses, $20,754 for travel expenses, and $11,235 for other expenses), and a net loss of $34,779. The $11,235 for other expenses was described as: "LOSS ON MARKET TRADES AND HOLDINGS AT DECEMBER 31, 1999". An attached schedule listed three securities lots, each with a respective date acquired and date sold between February 3 and October 13, 1999, for the $11,235 total net loss on the transactions. These trades were apparently conducted through an account in Mr. Arberg's name at Salomon Smith Barney. As in 1998, a Schedule D was also attached to the 1999 return and bore the notation "TAXPAYER HAS ELECTED BO [sic] BE A MARK TO MARKET TRADER UNDER IRC SECT. 475(F)(1)(A)".

Ms. Quinn likewise filed a separate return for 1999. The return reported, inter alia, wage income of $131,730 and net short-term capital gains from Schedule D of $196,121. The $196,121 in net short-term capital gains was derived from gross short-term sales proceeds of $761,300 shown on the Schedule D. The trades underlying the reported capital gains on stock sales were conducted through the E Trade account in Ms. Quinn's name.

For 2000, petitioners filed a joint Form 1040 reporting wage income of $2,150,838 ($2,022,517.92 of which was earned by Mr. Arberg from Corning Lasertron) and a $481,348 loss from an attached Schedule C for Mr. Arberg's "MARK TO MARKET TRADING" business.  The Schedule C detailed the following:

| | | |
|---|---:|---:|
| Gross income | | $65,372 |
| Expenses: | | |
| Other Interest | 42,570 | |
| Legal and professional services | 75,495 | |
| Office expense | 2,378 | |
| Travel | 30,072 | |
| Meals and entertainment | 1,332 | |
| Other expenses | 394,873 | |
| Total Expenses | | 546,720 |
| Net loss | | 481,348 |

Attached statements described the gross income as "MARK TO MARKET GAINS ON OPEN POSITIONS AT 12/31/2000" and listed the components of the other expenses:

| | |
|---|---:|
| Loss on market trades and holdings at December 31, 2000 | $380,595 |
| Telephone expenses | 5,616 |
| Computer expenses | 5,755 |
| Training/seminars | 2,907 |

The $380,595 loss was calculated by deducting cost basis from $34,910,868 in gross proceeds less commissions received on trades during 2000 in the E Trade account in Ms. Quinn's name.  E Trade Securities, Inc., reported to the Internal Revenue Service (IRS) stock and bond sales in the name of Ms. Quinn totaling $34,910,781 for 2000.

IRS Examinations

Mr. Arberg's 1999 tax return was examined by the IRS, and a notice of deficiency was issued to Mr. Arberg on June 19, 2002. In the notice, the IRS disallowed the $20,754 in travel expenses and $2,790 of car and truck expenses claimed on the Schedule C and instead recharacterized those amounts as miscellaneous unreimbursed employee expenses on Schedule A, Itemized Deductions. The changes resulted in a deficiency of $135. Mr. Arberg on July 3, 2002, signed a Form 5564, Notice of Deficiency Waiver, agreeing to immediate assessment and collection of the proposed deficiency, which waiver was received by the IRS in August of 2002.

Meanwhile, on September 18, 2001, the IRS commenced an examination of petitioners' joint return for 2000. During that examination, in March of 2002, petitioners provided the IRS with an unsigned joint Form 1040X, Amended U.S. Individual Income Tax Return, for 2000 and an unsigned revised Form 1040 for 2000 reflecting the changes noted on the Form 1040X. The returns were not intended to be filed or processed but purported to set forth petitioners' position for purposes of the audit. As relevant here, the principal difference between the original and the revised returns pertained to the reporting of the originally claimed Schedule C loss.

Petitioners' revised position entailed two Schedules C for Mr. Arberg. One addressed his business as a "Trader in Securities - Mark-to-Market accounting". That Schedule C reported zero gross income and claimed expenses of $1,207 for depreciation, $42,570 for other interest, $2,378 for office expenses, $1,067 for supplies, $1,000 for travel, and $4,311 for other expenses (comprising $2,907 for trading seminars and $1,404 for trading telephone). The resultant net loss for the alleged securities business was $52,533.

The other Schedule C dealt with a business labeled "Consultant". Reported gross income was again zero, and the expenses enumerated were $1,068 for supplies, $29,072 for travel, $1,332 for meals and entertainment, and $4,212 for other expenses (telephone). Those figures led to a net loss of $35,684 for the consultant business, and a total claimed Schedule C loss for both business of $88,217.

The revised position also incorporated a Form 4797, Sales of Business Property, reporting an ordinary loss of $313,413. An attached statement detailed that the claimed loss was computed from three components: (1) A $380,595 loss on trader transactions in the E Trade Securities account (calculated by subtracting an aggregate basis of $35,291,463 from an aggregate sales price of $34,910,868); (2) a $65,372 gain on trader transaction in the E Trade Securities account; and (3) a $1,810

transfer commission rebate.  Hence, with a few concessions, petitioners' revised position essentially restructured the reporting of their claimed business losses.  The position did not, however, alter the substance of their stance that activity in the E Trade account should generate ordinary income and losses because Mr. Arberg qualified as a trader in securities and that various business expenses incurred by him were deductible under section 162.

The examination culminated in the issuance of a notice of deficiency to petitioners' for 2000 on May 18, 2005.  The notice was based on the reporting in the original return.  Respondent therein disallowed all income and expenses claimed on the Schedule C but permitted a portion of the disallowed expenses as miscellaneous unreimbursed employee expenses (principally of Mr. Arberg) or investment expenses (of Ms. Quinn) on Schedule A.  The attached explanation of adjustments noted, inter alia, that "Melissa A. Quinn had not elected to use the Mark to Market Accounting Method for her trades in securities or commodities" and that petitioners had not established that the claimed expenses were incurred and/or paid for ordinary and necessary business purposes.  The instant petition and litigation followed.

OPINION

I.  Preliminary Matters

    A.  Amendment to Answer

    Trial in this case was held on February 7, 2007.  On
April 16, 2007, respondent filed a motion for leave to file
amendment to answer and lodged therewith the corresponding
amendment to answer.  Respondent seeks through the amendment to
conform the pleadings to the evidence adduced at trial and, based
on that evidence, specifically to raise the duty of consistency
as an affirmative defense supporting the determination made in
the notice of deficiency.  Petitioners on April 27, 2007, filed
an objection to respondent's motion, generally alleging
dilatoriness and prejudice.  Since opening briefs had meanwhile
been filed on April 24 and 27, 2007, the Court advised the
parties by order dated May 2, 2007, that it intended to rule on
the motion in conjunction with the opinion otherwise addressing
the substantive matters in this case and that the parties should
prepare their reply briefs so as to deal with the duty of
consistency in the event that respondent's motion was ultimately
granted.

    Rule 41 governs amended and supplemental pleadings.  Rule
41(a) covers amendments generally and provides in effect that
after a responsive pleading is served or 30 days if no responsive
pleading is permitted, "a party may amend a pleading only by

leave of Court or by written consent of the adverse party, and leave shall be given freely when justice so requires."  Like rule 15(a) of the Federal Rules of Civil Procedure, from which it is derived, Rule 41(a) reflects "a liberal attitude toward amendment of pleadings."  60 T.C. 1089 (explanatory note accompanying promulgation of Rule 41).  As such, it tempers Rules 34(b) and 39, which essentially deem waived any issue or affirmative defense not pleaded.  The U.S. Supreme Court has interpreted the "freely given" language of the rule 15(a) as follows:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.  In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be "freely given." * * * [Foman v. Davis, 371 U.S. 178, 182 (1962).]

Respondent's motion is premised particularly on Rule 41(b)(1), which reads:

> **(b) Amendments To Conform to the Evidence:**  (1) Issues Tried by Consent:  When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.  The Court, upon motion of any party at any time, may allow such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues, but failure to amend does not affect the result of the trial of these issues.

Whether to permit such an amendment to conform pleadings to the evidence is a matter within the sound discretion of the Court. E.g., Commissioner v. Estate of Long, 304 F.2d 136, 142-144 (9th Cir. 1962); Estate of Quick v. Commissioner, 110 T.C. 172, 178 (1998); Bhattacharyya v. Commissioner, T.C. Memo. 2007-19. It is well settled both that amendment under Rule 41 may be allowed at any time in a Tax Court proceeding through entry of decision and that an affirmative defense may properly be pleaded through the vehicle of a motion to conform under Rule 41(b)(1). E.g., Commissioner v. Finley, 265 F.2d 885, 888 (10th Cir. 1959), affg. O'Shea v. Commissioner, T.C. Memo. 1957-15 and T.C. Memo. 1957-16; LeFever v. Commissioner, 103 T.C. 525, 538 & n.16 (1994), affd. 100 F.3d 778 (10th Cir. 1996); Stromsted v. Commissioner, 53 T.C. 330, 340 & n.5 (1969); Pierce v. Commissioner, T.C. Memo. 2003-188.

The touchstone in evaluating whether to allow an amendment to conform pleadings to the evidence is the existence of unfair surprise or prejudice to the nonmoving party. E.g., Foman v. Davis, supra at 182; Estate of Quick v. Commissioner, supra at 178-180; Kroh v. Commissioner, 98 T.C. 383, 387-389 (1992); Markwardt v. Commissioner, 64 T.C. 989, 998 (1975); Bhattacharyya v. Commissioner, supra; Pierce v. Commissioner, supra. Such surprise or prejudice, in turn, rests largely on evidentiary and other considerations bearing on the nonmovant's opportunity to

respond. For instance, this and other courts may take into account whether the nonmovant would be prevented from presenting evidence that might have been introduced if the matter had been raised earlier; whether the evidence that supports the unpleaded issue was introduced without objection; whether the movant delayed unduly in raising the matter; and the like. E.g., Foman v. Davis, supra at 182; United States v. Shanbaum, 10 F.3d 305, 312-313 (5th Cir. 1994); Estate of Quick v. Commissioner, supra at 178-180; LeFever v. Commissioner, supra at 538 & n.16; Kroh v. Commissioner, supra at 388-389; Law v. Commissioner, 84 T.C. 985, 990-993 (1985); Markwardt v. Commissioner, supra at 998; Bhattacharyya v. Commissioner, supra; Pierce v. Commissioner, supra.

Here, as noted, respondent seeks to amend the answer to raise the affirmative defense of the duty of consistency as an alternative or supplemental position in support of the determined deficiency. Respondent argues that the duty of consistency should prevent petitioners from maintaining that ownership of the E Trade account, or the losses generated by trades therein, are attributable to other than Ms. Quinn. As will be explained in greater detail below, two items of evidence offer the primary support for this position. The most crucial element is testimony by Ms. Quinn at trial concerning the reporting of transactions in the E Trade account on her 1999 tax return. This testimony was

solicited by counsel for respondent on cross-examination, and the question generated no objection from petitioners' counsel. That testimony is then corroborated by copies of records maintained in IRS computer systems with respect to Ms. Quinn's 1999 return. The records were offered as an exhibit by respondent's counsel at trial and were, after review, admitted without objection from petitioners' counsel.

Petitioners filed an objection to respondent's motion for leave to file amendment to answer. The 2-page document makes a number of references to "dilatoriness" on the part of respondent and contains repeated statements to the effect that respondent has failed to offer reasons why amendment was not sought prior to trial. Petitioners also allude generally to "prejudice", but in only one context do they expound upon such allegations with anything that might be considered a more particularized explanation of how they would be disadvantaged: "Respondent's dilatory motion will seriously impede the filing of Post-Trial Briefs in this case, as Respondent's Motion will not be decided upon by this Court until after the submission of Petitioners' Post-Trial Brief. Petitioners will therefore be prejudiced in their compliance with this Court's post-trial briefing schedule." Petitioners further suggest that their cooperation should have bearing on our disposition of the motion.

With respect to petitioners' principal complaint that respondent is guilty of extreme and unexplained dilatoriness, the Court cannot agree. Respondent's motion is made expressly as a motion to conform the pleadings to the evidence. As such, it is premised on Rule 41(b)(1) and must necessarily be brought <u>after</u> the underlying issues have been tried. Respondent also notes specifically that the testimony and evidence introduced at trial led respondent to raise the duty of consistency defense that is the subject of the amendment sought. The reason for moving at this juncture, posttrial, is clear. Furthermore, given that transcripts of the proceedings would typically have been received by the parties in early March, and respondent would have required a reasonable period of time to review the testimony, research the issue, and prepare the motion and amendment, the April 16, 2007, filing date would not appear to signal any unreasonable delay.

Concerning petitioners' generalized references to prejudice, they have failed even to suggest that they possess relevant evidence that would have been introduced had the issue been earlier raised. See <u>Lilley v. Commissioner</u>, T.C. Memo. 1989-602 ("Petitioner does not suggest that he has evidence which might have been offered at trial to overcome" an affirmative defense raised under Rule 41.), affd. without published opinion 925 F.2d 417 (3d Cir. 1991). Nor do they suggest any manner in which their preparation or strategy for trying the case might have

differed. As to their more targeted references to the briefing schedule, the Court acted to assuage such concerns by advising the parties to address the duty of consistency in their reply briefs and extending the time for them to do so. Finally, regarding their allusions to cooperation, the Court would simply note that respondent in this case filed a motion to compel production of documents and a motion to compel responses to interrogatories, both of which the Court found appropriate to grant. Suffice it to say that the record does not support any suggestion on petitioners' part that their cooperation has been exemplary.

On reply brief, petitioners essentially reprise their objections to permitting respondent to raise the duty of consistency posttrial and, in apparent disregard of the warning in the Court's May 2, 2007, order, make no meaningful attempt to address the substance of the affirmative defense. In opposing amendment, they also make the somewhat baffling allegation that respondent's motion to amend is premised on a contention that respondent only learned at trial of petitioners' position that Ms. Quinn was restricted from trading in securities on account of her employment. Respondent, however, takes no such stance.

As previously explained, the critical information obtained at trial on which respondent's motion is based pertains to Ms. Quinn's 1999 tax reporting. Petitioners' assertions as to

the restrictions on Ms. Quinn's trading activities were expressly articulated in both the petition and their pretrial memorandum (and in a letter, a copy of which they attached to their reply brief, sent to the IRS during the examination process). Nothing in respondent's submissions can reasonably be interpreted to propound otherwise. Most importantly, petitioners continue to make only generalized references to surprise and disadvantage, without providing any specifics as to how they might be prejudiced in presenting relevant evidence.

Hence, the Court is faced with a situation where the evidence on which respondent's amendment is based was introduced at trial without objection from petitioners and where petitioners have not offered any particularized explanation of how their opportunity to present their case will be prejudiced by permitting the amendment.[4] Accordingly, the Court concludes that the issue of the duty of consistency was tried by implied consent and that the answer may properly be amended under Rule 41(b)(1) to conform to the evidence introduced at trial. Respondent's motion shall be granted.

---

[4] Interestingly, much of the balance of petitioners' reply brief is devoted to an argument that petitioners' uncontroverted testimony must be given substantial weight. That, i.e., crediting Ms. Quinn's testimony with respect to her 1999 reporting, is essentially what the Court will do to the extent that respondent's position as to the duty of consistency is sustained.

B. <u>Burden of Proof</u>

As a general rule, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving error therein. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Additionally, taxpayers are required to maintain records sufficient to establish the existence and amount of all items reported on the tax return, including both income and offsets or deductions therefrom. Sec. 6001; <u>Hradesky v. Commissioner</u>, 65 T.C. 87, 89-90 (1975), affd. 540 F.2d 821 (5th Cir. 1976); sec. 1.6001-1(a), Income Tax Regs. Deductions in particular are a matter of "legislative grace", and "a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms." <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934); see also Rule 142(a).

There exist, however, several exceptions that may modify the foregoing general rule. One is section 7491, with principles relevant to deficiency determinations set forth in subsection (a) and rules governing penalties and additions to tax addressed in subsection (c).

Section 7491(a)(1) may shift the burden to the Commissioner with respect to factual issues affecting liability for tax where the taxpayer introduces credible evidence, but the provision operates only where the taxpayer establishes that he or she has

complied under section 7491(a)(2) with all substantiation requirements, has maintained all required records, and has cooperated with reasonable requests for witnesses, information, documents, meetings, and interviews.  See H. Conf. Rept. 105-599, at 239-240 (1998), 1998-3 C.B. 747, 993-994.  Here, petitioners have made no argument directed towards burden of proof and consequently have not shown that all prerequisites for a shift of burden have been met.  In addition, leaving aside issues of substantiation recounted more fully below, the above-mentioned motions to compel production of documents and responses to interrogatories would suggest that petitioners' cooperation has been less than exemplary.  The Court therefore cannot conclude that section 7491(a) effects any shift of burden in the instant case.

Section 7491(c) provides that "the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title."  The Commissioner satisfies this burden of production by "[coming] forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty" but "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions." Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Rather, "it is the taxpayer's responsibility to raise those issues."  Id.  The

Court's conclusions with respect to burden under section 7491(c) will be detailed <u>infra</u> in conjunction with our discussion of the section 6662(a) penalty.

In a similar vein, section 6201(d) states:

> SEC. 6201(d). Required Reasonable Verification of Information Returns.--In any court proceeding, if a taxpayer asserts a reasonable dispute with respect to any item of income reported on an information return filed with the Secretary under subpart B or C of part III of subchapter A of chapter 61 by a third party and the taxpayer has fully cooperated with the Secretary (including providing, within a reasonable period of time, access to and inspection of all witnesses, information, and documents within the control of the taxpayer as reasonably requested by the Secretary), the Secretary shall have the burden of producing reasonable and probative information concerning such deficiency in addition to such information return.

Again, to the extent that respondent in determining the disputed deficiency may have relied upon third-party information returns reporting matters related to pertinent securities transactions, the full cooperation prerequisites for application of section 6201(d) would appear to render the statute inoperative here.

Lastly, a further exception is relevant to this proceeding. The Commissioner bears the burden of proof with respect to any affirmative defense or new matter raised in the answer. Rule 142(a)(1). As just described, by amendment to answer respondent here expressly pleads the duty of consistency as an affirmative defense. See <u>Cluck v. Commissioner</u>, 105 T.C. 324, 331 n.11 (1995) (characterizing the duty of consistency as an affirmative

defense). To summarize, then, the burden rests on petitioners to establish facts to overcome the determinations made in the notice of deficiency or to support any revised position raised during the examination of their 2000 return. Respondent, however, must shoulder the burden of showing applicability of the duty of consistency to the extent that respondent seeks to rely on the doctrine to prevent petitioners from taking a position contrary to one maintained in a prior year. See <u>Janis v. Commissioner</u>, T.C. Memo. 2004-117 (noting the Commissioner's burden of proof on a duty of consistency defense), affd. 461 F.3d 1080 (9th Cir. 2006), affd. 469 F.3d 256 (2d Cir. 2006).

## II. Treatment of Securities Transactions

### A. Contentions of the Parties

Petitioners argue that gains and losses derived from transactions in the E Trade account are properly treated as ordinary, rather than capital, in nature. Their position in this regard rests on two principal contentions. First, they assert that the trades in the E Trade account are properly treated as trades of Mr. Arberg, not Ms. Quinn. As support for this claim they look to an alleged power of attorney, to trust law in the State of Georgia, and to what they characterize as the "legal preclusion doctrine". Second, they maintain that Mr. Arberg qualifies as a trader within the meaning of section 475.

Conversely, respondent advances as a primary position that ownership of and trades in the E Trade account must be attributed to Ms. Quinn. Respondent has noted in this connection both the duty of consistency and the Danielson rule, as well as the insufficiency of any theory premised on a power of attorney. As an alternative position, respondent maintains that even if the account and trades are attributed to Mr. Arberg, he fails to qualify as a trader in securities for purposes of section 475.

B. General Rules Re: Federal Tax Treatment of Securities Transactions and Trading

For Federal tax purposes, transactions in securities are conducted in one of three capacities; i.e., as a dealer, a trader, or an investor, and the tax treatment of a given transaction turns upon which of these characterizations applies. E.g., King v. Commissioner, 89 T.C. 445, 457-459 (1987); Chen v. Commissioner, T.C. Memo. 2004-132; Boatner v. Commissioner, T.C. Memo. 1997-379, affd. without published opinion 164 F.3d 629 (9th Cir. 1998). Dealers are those who are engaged in the business of buying and selling securities and whose business involves sales to customers. E.g., King v. Commissioner, supra at 457; Chen v. Commissioner, supra; Boatner v. Commissioner, supra. Securities in the hands of dealers are therefore excluded from the definition of a capital asset, falling within the exception for "property held by the taxpayer primarily for sale to customers in

the ordinary course of his trade or business". Sec. 1221(a)(1); see also King v. Commissioner, supra at 457-458; Chen v. Commissioner, supra; Boatner v. Commissioner, supra. As a result, a dealer's sales of securities are the equivalent of sales of inventory and produce ordinary gains and losses. E.g., King v. Commissioner, supra at 457-458; Chen v. Commissioner, supra; Boatner v. Commissioner, supra. Attendant business expenses are deductible under section 162(a) and interest is not subject to the restrictions under section 163(d) on the deduction of "investment interest". E.g., King v. Commissioner, supra at 457, 460.

Traders, like dealers, are engaged in the trade or business of selling securities, but they do so for their own account. E.g., Groetzinger v. Commissioner, 771 F.2d 269, 274-275 (7th Cir. 1985), affg. 82 T.C. 793 (1984), affd. 480 U.S. 23 (1987); Moller v. United States, 721 F.2d 810, 813 (Fed. Cir. 1983); King v. Commissioner, supra at 457-458; Chen v. Commissioner, supra; Boatner v. Commissioner, supra. Hence, their securities are not excluded from the definition of a capital asset due to the absence of customers, and sales thereof produce capital gains and losses under generally applicable principles. E.g., King v. Commissioner, supra at 457; Chen v. Commissioner, supra; Boatner v. Commissioner, supra. Because of the trade or business context, however, expenses are deductible under section 162(a)

and the interest limitations of section 163(d) do not apply. E.g., King v. Commissioner, supra at 457-463; Boatner v. Commissioner, supra.

Investors likewise buy and sell for their own account, but they are not considered to be in the trade or business of selling securities. E.g., Groetzinger v. Commissioner, supra at 274-275; Moller v. United States, supra at 813; King v. Commissioner, supra at 458-459; Chen v. Commissioner, supra; Boatner v. Commissioner, supra; Mayer v. Commissioner, T.C. Memo. 1994-209. Expenses are deductible only under section 212 as itemized deductions, and deduction of interest is restricted by section 163(d). E.g., King v. Commissioner, supra at 460-461; Boatner v. Commissioner, supra; Mayer v. Commissioner, supra. Their transactions, too, are capital in nature. E.g., King v. Commissioner, supra at 457-459; Chen v. Commissioner, supra; Boatner v. Commissioner, supra.

Nonetheless, a distinction, relevant here, exists between a trader and an investor with respect to capital treatment. Only a trader, and not an investor, is entitled to make a mark-to-market election pursuant to section 475(f), with the consequence that gains and losses are treated as ordinary in character under section 475(d)(3)(A)(i) and (f)(1)(D). E.g., Vines v. Commissioner, 126 T.C. 279, 287-288 (2006); Knish v. Commissioner, T.C. Memo. 2006-268; Lehrer v. Commissioner, T.C.

Memo. 2005-167; <u>Chen v. Commissioner</u>, <u>supra</u>.  Ordinary losses are thereby made available to offset ordinary income and are not subject to the \$3,000 (or \$1,500) limitation imposed by section 1211(b) on the deduction by an individual of capital losses in excess of capital gains.  E.g., <u>Vines v. Commissioner</u>, <u>supra</u> at 288; <u>Knish v. Commissioner</u>, <u>supra</u>; <u>Lehrer v. Commissioner</u>, <u>supra</u>; <u>Chen v. Commissioner</u>, <u>supra</u>.

C.  <u>Attribution of E Trade Transactions</u>

The doctrine of the duty of consistency, also known as "quasi-estoppel" is among the equitable principles applicable in this Court.  E.g., <u>Herrington v. Commissioner</u>, 854 F.2d 755, 757 (5th Cir. 1988), affg. <u>Glass v. Commissioner</u>, 87 T.C. 1087 (1986); <u>Cluck v. Commissioner</u>, 105 T.C. at 331; <u>LeFever v. Commissioner</u>, 103 T.C. at 541; <u>Janis v. Commissioner</u>, T.C. Memo. 2004-117.  The doctrine, derived from <u>R.H. Stearns Co. v. United States</u>, 291 U.S. 54 (1934), rests upon the premise that a taxpayer has a duty to be consistent in the tax treatment of items and will not be permitted to benefit from the taxpayer's own prior error or omission.  E.g., <u>Herrington v. Commissioner</u>, <u>supra</u> at 757; <u>Shook v. United States</u>, 713 F.2d 662, 666-667 (11th Cir. 1983); <u>Beltzer v. United States</u>, 495 F.2d 211, 212 (8th Cir. 1974); <u>Estate of Letts v. Commissioner</u>, 109 T.C. 290, 296 (1997), affd. without published opinion 212 F.3d 600 (11th Cir. 2000);

LeFever v. Commissioner, supra at 541; Janis v. Commissioner, supra.

This duty operates to preclude the taxpayer from taking a position in an earlier year and a contrary position in a later year, after expiration of the statute of limitations on the earlier year. E.g., Herrington v. Commissioner, supra at 757; Shook v. United States, supra at 667; Beltzer v. United States, supra at 212; Estate of Letts v. Commissioner, supra at 296; Cluck v. Commissioner, supra at 331; LeFever v. Commissioner, supra at 541-542; Janis v. Commissioner, supra. In practice, the doctrine "prevents a taxpayer from claiming that he or she should have paid more tax before and so avoiding the present tax." Estate of Letts v. Commissioner, supra at 296. An exception exists in that the doctrine is not applicable to pure questions of law, as opposed to questions of fact and mixed questions of fact and law. E.g., Herrington v. Commissioner, supra at 758; Estate of Letts v. Commissioner, supra at 302.

Both this and other courts, including the Court of Appeals for the Eleventh Circuit, to which appeal in the instant case would normally lie, identify three elements as conditions precedent to application of the duty of consistency: (1) The taxpayer has made a representation of fact or reported an item for tax purposes in one year; (2) the Commissioner has acquiesced in or relied on that fact for that year; and (3) the taxpayer

desires to change the representation previously made in a later year after the statute of limitations bars adjustments for the earlier year.  E.g., <u>Herrington v. Commissioner</u>, <u>supra</u> at 758; <u>Shook v. United States</u>, <u>supra</u> at 667; <u>Beltzer v. United States</u>, <u>supra</u> at 212; <u>Estate of Letts v. Commissioner</u>, <u>supra</u> at 297; <u>Cluck v. Commissioner</u>, <u>supra</u> at 332; <u>LeFever v. Commissioner</u>, <u>supra</u> at 543; <u>Janis v. Commissioner</u>, <u>supra</u>.

Turning to the case at bar, the Court first considers whether petitioners have in their tax reporting made a pertinent representation of fact.  In this connection, "a taxpayer's treatment of an item on a return can be a representation that facts exist which are consistent with how the taxpayer reports the item on the return."  <u>Estate of Letts v. Commissioner</u>, <u>supra</u> at 299-300.  Throughout this proceeding, petitioners have maintained that, from the time the E Trade account was established in 1998, Mr. Arberg conducted all trading activity taking place therein.  Nonetheless, on her separate tax return for 1999, Ms. Quinn reported proceeds from transactions in the E Trade account as capital gain.  Conversely, on his separate tax return for 1999, Mr. Arberg did not report any proceeds from transactions in the E Trade account, whether as ordinary income or otherwise.

The above-described reporting constitutes a representation that Ms. Quinn is the owner of the E Trade account, that gains

and losses therein are properly attributable to her, and that such transactions are capital in nature. Accordingly, the first element for the duty of consistency is satisfied.

The second inquiry is whether respondent acquiesced in or relied on the facts attested by petitioners' reporting. Caselaw establishes that the necessary acquiescence exists where a taxpayer's return is accepted as filed; examination of the return is not required. E.g., Estate of Letts v. Commissioner, supra at 300; LeFever v. Commissioner, supra at 543-544; Bentley Court II Ltd. Pship. v. Commissioner, T.C. Memo. 2006-113. Here, respondent accepted Ms. Quinn's 1999 return reporting capital gain as filed. Mr. Arberg's 1999 return was examined and changes were made, but no adjustment to include gains from transactions in the E Trade account was involved. The resultant deficiency was agreed to by Mr. Arberg and assessed by the IRS. Hence, the second element poses no barrier to application of the duty of consistency.

The third question probes whether the taxpayer is changing a representation previously made after the time to assess additional tax for the earlier year has passed. Petitioners, as reflected in their joint return and revised return for 2000 and in their arguments herein, seek to alter their 1999 reporting position to contend that ownership of and/or proceeds of transactions in the E Trade account are attributable to

Mr. Arberg and are ordinary in nature. Furthermore, the record indicates and respondent states that any opportunity to assess additional taxes for 1999 based on this changed position would have expired, and petitioners have at no time alleged to the contrary.

The general statue of limitations on assessment pursuant to section 6501(a) is 3 years from the date the return is filed. The statutory period for a 1999 return would therefore typically terminate in 2003. To the extent it could be argued that petitioners' change in position was timely disclosed to the IRS, the Court would reject any such suggestion in the unique circumstances of this case. Although petitioners filed their 2000 return in April of 2001 and provided their revised 2000 return in March of 2002, Mr. Arberg on July 3, 2002, signed a Form 5564, Notice of Deficiency Waiver, with respect to 1999. The last documentary submission reflected by the record as having been given to the IRS, prior to expiration of the period of limitations for 1999, regarding petitioners' 1999 and 2000 reporting of the E Trade account would thus seem to reaffirm the original 1999 reporting of the account as other than Mr. Arberg's.

Additionally, as of the time motions to compel were filed in this case in December of 2006, respondent represented that petitioners still had not provided documentation of the transfers

of cash employed to open the E Trade account or of the trades conducted therein.  Given this convoluted trail, the Court agrees with respondent that the substance of what petitioners had claimed at various junctures and were now claiming concerning the E Trade account only became clear enough adequately to disclose a change in position and support a duty of consistency argument through testimony elicited at trial.  On these facts, the Court concludes that all three elements for application of the duty of consistency are met.

Where the three prongs of the test are met, the consequence is that the Commissioner may act as if the previous representation remains true, even if it is not, and the taxpayer is barred from asserting to the contrary.  E.g., Herrington v. Commissioner, 854 F.2d at 758; Estate of Letts v. Commissioner, 109 T.C. at 297; Janis v. Commissioner, T.C. Memo. 2004-117. Hence, petitioners here are properly estopped from claiming that ownership of or proceeds from transactions in the E Trade account are attributable to other than Ms. Quinn.  As a result, petitioners' various arguments regarding attribution to Mr. Arberg, even if otherwise legally meritorious, cannot be sustained.  The Court therefore need not further consider petitioners' contentions with respect to an alleged power of attorney, to trust law in the State of Georgia, or to their so-called legal preclusion doctrine.

However, for the sake of completeness, the Court would note briefly that even if the Court were to deny respondent's motion and/or rule against respondent on the duty of consistency argument, none of the theories advanced by petitioners would be sufficient to overcome the form of the E Trade account and thus to show that transactions therein should be considered those of Mr. Arberg.  To highlight a few shortcomings, the Court would begin by observing that petitioners have generally failed to introduce evidence that would establish the factual predicate for the doctrines they cite.

As to an alleged power of attorney, petitioners have not proffered even one document related to any such grant of authority.  Furthermore, even if the record corroborated a power of attorney in favor of Mr. Arberg, that fact would actually cut against petitioners' position, indicating instead that Mr. Arberg was acting on Ms. Quinn's behalf and dealing with her property, not his own.

Likewise, to show either a resulting or a constructive trust under Georgia law, petitioners would need as a threshold matter to establish the source of the funding for the E Trade account. See Ga. Code Ann. secs. 53-12-91, 53-12-92, 53-12-93 (1997).  Yet petitioners did not introduce any document related to tracing the moneys deposited in the E Trade account (or, for that matter, even to the opening of the account) and only testified generally

that funds came from Mr. Arberg's work.  They made no explicit claim regarding an exclusive source and certainly offered no information as to the possibility of prior commingling, nor did they discuss or address any other potentially relevant issues.

Lastly, with respect to their so-called legal preclusion doctrine, petitioners have again failed to make a predicate factual showing.  See Commissioner v. First Sec. Bank of Utah, N.A., 405 U.S. 394, 395, 403 (1972) (declining to permit allocation of income by the Commissioner under section 482 to a taxpayer "that he did not receive and that he was prohibited from receiving").  Although petitioners state on brief that Ms. Quinn was prohibited due to her employment from beneficially owning a securities account or trading in securities for her own account, they testified that she received permission from her supervisor to establish the E Trade account.  They introduced no evidence or testimony to delineate the parameters or conditions of any such permission, so the Court is unable to evaluate limitations as to this particular account.

Accordingly, without even delving into the host of legal strictures and requisites that would bear upon the applicability of petitioners' theories, the Court is satisfied that patent deficiencies in the underlying factual record would short circuit petitioners' attempts to reach their desired result through these avenues.  Therefore, the transactions in the E Trade account must

be treated as those of Ms. Quinn, whether because of the duty of consistency or because petitioners have failed to meet their burden of proof in overcoming the basis for respondent's deficiency determinations.

As a consequence of the above; i.e., that transactions in the E Trade account cannot be treated as those of Mr. Arberg, in conjunction with the fact that petitioners have never contended or proffered evidence to show that Mr. Arberg engaged in trading through other accounts in 2000 or that Ms. Quinn was a trader in securities, the Court need not probe further into the qualifications for trader status.  A priori, one to whom particular securities transactions cannot be attributed cannot be said to be in the business of trading those securities for his or her own account.  Section 475(f) trader status and attendant ordinary loss treatment is thus unavailable in any event.

III.  Expense Deductions

Deductions are a matter of "legislative grace", and "a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms."  New Colonial Ice Co. v. Helvering, 292 U.S. at 440; see also Rule 142(a).  As a general rule, section 162(a) authorizes a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  An expense is ordinary for purposes of this section if it is

normal or customary within a particular trade, business, or industry.  Deputy v. Du Pont, 308 U.S. 488, 495 (1940).  An expense is necessary if it is appropriate and helpful for the development of the business.  Commissioner v. Heininger, 320 U.S. 467, 471 (1943).  Section 262, in contrast, precludes deduction of "personal, living, or family expenses."

The breadth of section 162(a) is tempered by the requirement that any amount claimed as a business expense must be substantiated, and taxpayers are required to maintain records sufficient therefor.  Sec. 6001; Hradesky v. Commissioner, 65 T.C. at 89-90; sec. 1.6001-1(a), Income Tax Regs.  When a taxpayer adequately establishes that he or she paid or incurred a deductible expense but does not establish the precise amount, we may in some circumstances estimate the allowable deduction, bearing heavily against the taxpayer whose inexactitude is of his or her own making.  Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930).  There must, however, be sufficient evidence in the record to provide a basis upon which an estimate may be made and to permit us to conclude that a deductible expense, rather than a nondeductible personal expense, was incurred in at least the amount allowed.  Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

Furthermore, business expenses described in section 274 are subject to rules of substantiation that supersede the doctrine of Cohan v. Commissioner, supra. Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), affd. 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). Section 274(d) provides that no deduction shall be allowed for, among other things, traveling expenses, entertainment expenses, gifts, and expenses with respect to listed property (as defined in section 280F(d)(4) and including passenger automobiles, computer equipment, and cellular telephones) "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement": (1) The amount of the expenditure or use; (2) the time and place of the expenditure or use, or date and description of the gift; (3) the business purpose of the expenditure or use; and (4) in the case of entertainment or gifts, the business relationship to the taxpayer of the recipients or persons entertained. Sec. 274(d).

On this issue, petitioners neither at trial nor on brief offered argument directed towards the deductibility of any of the specific expenses disallowed or recharacterized by respondent. Rather, their contentions seem to be confined to the following generalized paragraph on reply brief:

> Similarly, Respondent repeatedly contends in his Brief
> (e.g., at 10, 11) that Petitioners failed to

> substantiate the deductions claimed in the return for the year in issue, 2000. Again, this is a fantasy on the part of Respondent's counsel. For example, Exhibit 8-P, containing documentary support for itemized deductions for the year in issue, is nearly one inch thick.

The referenced exhibit is in fact Exhibit 7-P (Exhibit 8-R is a 5-page copy of respondent's interrogatories to petitioners) and consists of dozens of pages of photocopied tickets, receipts, bills, and invoices, some of which are illegible, interspersed with a few lists purporting to summarize totals by category. None of the materials establish a connection between the expense incurred and any particular business activity of petitioners.

As alluded to previously, respondent disallowed certain of the expenses in their entirety while permitting a large percentage to be claimed as miscellaneous deductions on Schedule A. Petitioners' failure to address individual expenditures leaves their position at this juncture unclear. To the extent that they continue to maintain that the expenses should be allowed on Schedule C as attributed to a securities trading and/or consulting business of Mr. Arberg, suffice it to say that nothing in the record links any given outlay to a sole proprietorship venture conducted by Mr. Arberg, much less demonstrates any rational basis for allocating many of the claimed items between the alleged securities trading and consulting as separate Schedule C business activities.

Even more fundamentally, the Court would reiterate that the lack of securities trades attributable to Mr. Arberg preempts the contention that he was involved in a securities trading business through the E Trade account. Similarly, the following nebulous testimony hardly establishes the bona fides and contours of a consulting business in 2000 or suggests types of expenses that might have been incurred:

> Q    When were the services for SI Diamond completed?
>
> A    In the late 1990s.
>
> Q    Did there come a time that you performed services for SI Diamond later?
>
> A    Yes, I think I did again. In 2001 or 2002, I think I did again. Actually, I know I did. So again, no, 2003, I think it was.
>
> Q    Did those services commence in late 2000?
>
> A    It's possible, yes. I mean, I would have to see a piece of paper to remind me.

In this connection, it is also noteworthy that the Schedule C for the alleged consulting business incorporated in petitioners' revised Form 1040 for 2000 reports no gross receipts.

Accordingly, multiple grounds exists for the sustaining of respondent's determinations. In general, the collection of photocopied receipts, etc., is, absent further explanation, insufficient even to satisfy the threshold section 162 requirement of showing that the amount was paid or incurred in carrying on a particular trade or business. A fortiori, for the

travel, meals and entertainment, and computer expenses, such evidence necessarily falls short of meeting the heightened substantiation requisites of section 274. The dearth of relevant testimony compounds these shortcomings, and the disallowed or questionable nature of the alleged underlying businesses raises yet another barrier.

In addition, with respect to the $42,570 claimed as other interest, certain further rules come into play. The record establishes that $42,569.95 was incurred as margin interest on the E Trade account. However, because the Court has concluded that activity in the E Trade account must be attributed to Ms. Quinn, and because no claim or showing has been made that Ms. Quinn conducted a securities trading business, the limitations of section 163(d) with respect to investment interest would be applicable. Moreover, since petitioners have offered no substantiation concerning any offsetting investment income, the Court is not in a position to evaluate petitioners' situation within the strictures of section 163(d) and thereby to conclude that any amount would be allowable for deduction in 2000 or available for carryover in future years.

To summarize, petitioners are not entitled to claimed expenses except as allowed by respondent as miscellaneous deductions on Schedule A.

IV. Accuracy-Related Penalty

Subsection (a) of section 6662 imposes an accuracy-related penalty in the amount of 20 percent of any underpayment that is attributable to causes specified in subsection (b).  Subsection (b) of section 6662 then provides that among the causes justifying imposition of the penalty are:  (1) Negligence or disregard of rules or regulations and (2) any substantial understatement of income tax.

"Negligence" is defined in section 6662(c) as "any failure to make a reasonable attempt to comply with the provisions of this title", and "disregard" as "any careless, reckless, or intentional disregard."  Caselaw similarly states that "'Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'"  Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Pursuant to regulations, "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly."  Sec. 1.6662-3(b)(1), Income Tax Regs.

A "substantial understatement" is declared by section 6662(d)(1) to exist where the amount of the understatement

exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $5,000 ($10,000 in the case of a corporation). For purposes of this computation, the amount of the understatement is reduced to the extent attributable to an item: (1) For which there existed substantial authority for the taxpayer's treatment thereof, or (2) with respect to which relevant facts were adequately disclosed on the taxpayer's return or an attached statement and there existed a reasonable basis for the taxpayer's treatment of the item. See sec. 6662(d)(2)(B).

An exception to the section 6662(a) penalty is set forth in section 6664(c)(1) and reads: "No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."

Regulations interpreting section 6664(c) state:

The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. * * * Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. * * * [Sec. 1.6664-4(b)(1), Income Tax Regs.]

Reliance upon the advice of a tax professional may, but does not necessarily, demonstrate reasonable cause and good faith in the context of the section 6662(a) penalty. Id.; see also United States v. Boyle, 469 U.S. 241, 251 (1985); Freytag v. Commissioner, supra at 888. Such reliance is not an absolute

defense, but it is a factor to be considered.  Freytag v. Commissioner, supra at 888.

In order for this factor to be given dispositive weight, the taxpayer claiming reliance on a professional must show, at minimum:  "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment."  Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002); see also, e.g., Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 & n.8 (9th Cir. 2005) (quoting verbatim and with approval the above three-prong test), affg. 121 T.C. 89 (2003); Westbrook v. Commissioner, 68 F.3d 868, 881 (5th Cir. 1995), affg. T.C. Memo. 1993-634; Cramer v. Commissioner, 101 T.C. 225, 251 (1993), affd. 64 F.3d 1406 (9th Cir. 1995); Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978); Pessin v. Commissioner, 59 T.C. 473, 489 (1972); Ellwest Stereo Theatres of Memphis, Inc. v. Commissioner, T.C. Memo. 1995-610.

As previously indicated, section 7491(c) places the burden of production on the Commissioner.  The notice of deficiency issued to petitioners asserted applicability of the section 6662(a) penalty on account of both negligence and/or substantial understatement.  See sec. 6662(b).  Respondent on brief likewise

discusses both bases.  Petitioners, on the other hand, proffer no argument on brief with respect to the penalty, and at no time have they adduced any testimony or other evidence directed specifically thereto.  They apparently rely on the position that they are not liable for the deficiency from which the penalty derives.

The record in this case satisfies respondent's burden of production under section 7491(c) with respect to both negligence and substantial understatement.  The dearth of pertinent records, the unexplained inconsistencies in treatment of the E Trade account and Mr. Arberg's various alleged businesses, and an understatement well in excess of the statutory 10 percent or $5,000 limit are illustrative.  With this threshold showing, the burden shifts to petitioners to establish that they acted with reasonable cause and in good faith.

One key feature of this litigation preempts any conclusion of good faith.  Petitioners have never attempted to explain why they claimed capital treatment when the E Trade account generated gains, then changed course the following year to claim ordinary income treatment when the account generated losses.  Absent some offer of justification, the appearance of manipulation or selective application of the tax rules to achieve an advantage is unavoidable.  The Court sustains imposition of the section 6662(a) accuracy-related penalty.

To reflect the foregoing,

<u>An appropriate order and decision for respondent will be entered</u>.