FREDERICK R. MAYER AND JAN PERRY MAYER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mayer v. Commissioner
Docket No. 12927-91
United States Tax Court
T.C. Memo 1994-209; 1994 Tax Ct. Memo LEXIS 216; 67 T.C.M. (CCH) 2949; May 11, 1994, Filed *216 Decision will be entered for respondent. Ps employed money managers who engaged in numerous securities transactions on Ps' behalf during the years in issue. Ps actively oversaw the money managers. Ps' focus was long-term capital growth. The average holding period of Ps' stocks sold during the years in issue was approximately 1 year. Ps' principal sources of income from their securities transactions were dividends, interest, and long-term capital gains. Ps did not allocate any costs of their securities activity to particular purchases or sales. Held: Ps were mere investors, and their securities activity does not constitute a trade or business. Held, further, Ps may not capitalize their securities-related costs incurred during the years in issue. Held, further, Ps' securities activity was not a passive activity within the meaning of sec. 469, I.R.C., so their capital gains from sales of securities were not passive income. For petitioners: Claude R. Wilson, Jr., Kemble White, and Susan P. Mueller. For respondent: Curt M. Rubin and Brian Condon. LARO
LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: This case is before the Court on the petition *217 of Frederick R. Mayer and Jan Perry Mayer (petitioners) for redetermination of respondent's determinations reflected in her notice of deficiency. Respondent determined deficiencies in petitioners' Federal income tax as follows: Year
Deficiency
1986
[1] $ 255,225
1987
392,342
1988
41,119
The issues for decision are: (1) Whether petitioners were engaged in the trade or business of trading securities. We hold they were not. (2) Whether petitioners may add their securities-related expenses to the cost basis of stocks purchased and to the sales expenses of stocks sold if they were not engaged in the trade or business of trading securities, but were investors in securities. We hold they may not. (3) Whether petitioners may treat certain investment income as income from a passive activity under section 469. [1] We hold they may not. *218 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by this reference. Petitioners are husband and wife; they resided in Denver, Colorado, when they filed their petition. Petitioners' Federal income tax returns for the years in issue included a Schedule C, Profit or (Loss) from Business or Profession (Sole Proprietorship), for an activity they reported as the business "trader in securities". Petitioners reported gross receipts on that Schedule C in the following amounts for each year in issue: Year
Amount
1986
$ 20,781,059
1987
18,471,132 1988
14,443,939 For each year in issue, petitioners determined their "cost of goods sold" by adding "cost of securities sold in trading activities" to "net capital gains reported on Schedule D". Accordingly, in each year, petitioners reported "cost of goods sold" equal to their "gross receipts". For 1986 and 1987, this approach resulted in a net loss equal to the amount of expenses reported for that year. For 1988, because petitioners determined that part of the net loss from the securities activity was not allowable, petitioners reported *219 a net loss of $ 696,467. Petitioners reported the following expenses on their Schedule C for the securities activity for each of the years in issue: Expense
1986 1987 1988 Investment management fee
$ 1,250,200
$ 1,359,367
$ 1,254,693
Bank service charges
483
0
0
Legal/professional fees
915
0
45,950
Rent
220
0
0
Sweep fees
260
354
0
Miscellaneous
5
43,755
358
Interest
0
0
17,537
Postage
0
0
15
Fee for letters of credit
0
0
4,000
Custodial fees
24,041
29,909
41,864
Total  $ 1,276,124
$ 1,433,385
$ 1,364,917
The "investment management fee" represents the amount petitioners paid to Captiva Corp. (Captiva), discussed below, for investment and other expenses incurred on petitioners' behalf. Petitioners reported the net capital gain they realized from their investment activities as passive income on their 1987 and 1988 Federal income tax returns. This enabled petitioners to offset their capital gains with passive losses from limited partnerships and subchapter S corporations. Captiva Corp.
In June 1980, Frederick R. Mayer (Mr. Mayer) sold for $ 134.5 million an oil drilling company he had started in 1953; 60 percent of the sales *220 proceeds went to him personally. On December 21, 1982, he organized Captiva for the purpose of managing petitioners' assets, particularly the proceeds from the sale of the drilling company. In organizing Captiva, Mr. Mayer's concept was that he would be a manager of money managers. Captiva never had any capital. Mr. Mayer felt it was easier to conduct business in corporate form; he believed that it would be difficult to lease office space, hire employees, and pay worker's compensation as an individual. Mr. Mayer structured Captiva using pension funds as a model in both the investment structure and the organizational structure. He was the sole shareholder and president of Captiva. He hired Dr. Katherine N. Cattanach (Cattanach), a professor of finance at the graduate business school at the University of Denver, as executive vice president; Cattanach handled the investment side of Captiva. On January 1, 1983, Mr. Mayer hired Gloria Higgins (Higgins) as vice president of finance and chief financial officer; Higgins handled the operating side of Captiva. The percentage of petitioners' total cash, stock, and bonds held in managed accounts, by fair market value, was 86 percent *221 on December 31, 1986; 92.5 percent on December 31, 1987; and 74.9 percent on December 31, 1988. [2] Because petitioners wanted to preserve their money, their primary focus was preservation of capital, which required diversification. Thus, Mr. Mayer and Cattanach selected various money managers who each had different specialties. The money managers were employed directly by petitioners. During the years in issue, Mr. Mayer employed eight money managers, each of whom had a different investment style. [3] Mrs. Mayer employed only two of the eight money managers to manage her accounts. *222 Mr. Mayer, Cattanach, and Higgins met three times a year to determine the allocation of funds among the money managers. [4] Each money manager was given the sole discretion to manage the portion of petitioners' investment portfolio allocated to him or her in accordance with that manager's investment strategy. Typically, with respect to the purchase and sale of securities in the managed accounts, the money managers conducted research, made the buy/sell decision, chose the broker/dealer, and gave the buy/sell order to the broker/dealer. The trade was settled by the custodian of the assets. [5] Petitioners had the right to terminate the relationship if the money manager managed the account contrary to the agreed-upon investment style, and from time to *223 time they did so. Mr. Mayer had a letter of understanding with each of the money managers. The letters of understanding reflected his goal for each account to increase by 10 percent a year, over and above inflation. The letters of understanding typically stated in part: That portion of capital which is placed with you is not necessary to meet any of the Mayer family's living requirements. Therefore, the overriding goal for this portion of the asset base is one of wealth maximization through capital appreciation. * * * As the capital placed in this account is not necessary for living requirements, and because there is a significant tax burden placed on investment income, returns gained through capital appreciation are clearly to be *224 preferred whenever a choice is to be made.
Pursuant to their request, petitioners were sent all dividends and interest from their accounts quarterly. [6]
*225 Mr. Mayer would give a money manager 3 years to prove himself or herself. Mr. Mayer's criteria were rate of return and compliance with the agreed investment niche; the managers were not judged on whether they were rapidly turning over the stocks in the portfolio. The money managers generally reported their investment performance to Captiva in writing quarterly. Cattanach and Mr. Mayer also monitored the managers' monthly reports to insure that the securities they were buying and selling comported with their agreement as to investment style. Mr. Mayer has no formal training in securities analysis, and he has never had a seat on a stock exchange. Mr. Mayer and Cattanach read business publications, traded information with knowledgeable people, and attended continuing education seminars. Mr. Mayer's work for Captiva included involvement in limited partnerships, S corporations, and venture capital partnerships. This work was a full-time job for which he drew a salary of approximately $ 90,000 annually. Part of Captiva's function was to serve as a recordkeeping and bookkeeping center for the securities owned by petitioners. Captiva also handled matters for petitioners' sons. *226 All of Captiva's expenses were reimbursed by petitioners and their sons. Captiva never charged the family enough to reimburse all of its expenses, so it consistently operated in a net operating loss position. Petitioners' Securities Transactions
The number of each petitioner's sales and purchases of securities for each year in issue was as follows: [7] *227 Mr. Mayer's Mrs. Mayer's
Year
Number of Transactions
Number of Transactions
1986
1,140
104
1987
1,569
106
1988
1,136
31
The weighted average holding period in days for securities sold in each petitioner's managed accounts was as follows: [8]
Mr. Mayer's Weighted
Mrs. Mayer's Weighted Year
Average Holding Period
Average Holding Period
1986
317
545
1987
439
439
1988
415
438
For each of the years in issue, the percentages of petitioners' stock sales (by dollar value) with the holding periods listed below were as follows: Percentage Holding Period
1986
1987
1988
0-30 days
4.02
5.41
.01
30 days-3 months
13.83
15.59
11.40
3-6 months
11.49
13.58
11.03
6 months-1 year
38.19
24.81
13.39
1-3+ years
32.47
40.61
44.17
During the years in issue, petitioners received the following amounts of net long-term capital gain (or loss), dividends, and interest, which constituted the following percentages of their total securities income for that year: [9]
Net
Long-Term Long-Term
Capital
Total
Percent
Gains, Capital
Dividends &
Securities
of Total
Year
Gain/(Loss)
Dividends
Interest
Interest
[1]Income [2]Income 1986
$ 6,483,428
$ 548,299  $ 853,579
$ 7,885,306
$ 8,903,783
88.56
1987
3,666,105
590,761
919,381
5,176,247
5,818,208
88.97
1988
177,060
1,049,087
787,783
2,013,930
2,372,787
84.88
*228 OPINION The Internal Revenue Code does not define the term "trade or business". Commissioner v. Groetzinger, 480 U.S. 23, 27 (1987); Estate of Yaeger v. Commissioner, 889 F.2d 29, 33 (2d Cir. 1989), affg. 92 T.C. 180 (1989). Whether Mr. Mayer's securities activities during the years in issue constituted a trade or business is a question of fact. [10]Higgins v. Commissioner, 312 U.S. 212, 217 (1941); Estate of Yaeger v. Commissioner, supra at 33; Paoli v. Commissioner, T.C. Memo. 1991-351. Petitioners have the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In determining whether *229 a taxpayer in a securities activity is engaged in a trade or business, courts have distinguished between "traders", who are in a trade or business, and "investors", who are not. Moller v. United States, 721 F.2d 810, 813 (Fed. Cir. 1983); see also Levin v. United States, 220 Ct. Cl. 197; 597 F.2d 760, 765 (1979). Management of securities investments, whatever the extent and scope of such activity, is seen as the work of a mere investor, "not the trade or business of a trader." Estate of Yaeger v. Commissioner, supra at 34; see also Whipple v. Commissioner, 373 U.S. 193, 202 (1963); Higgins v. Commissioner, supra at 217; Paoli v. Commissioner, supra; Beals v. Commissioner, T.C. Memo. 1987-171. This result is the same notwithstanding the amount of time the individual devotes to the activity. Even "full-time market activity in managing and preserving one's own estate is not embraced within the phrase 'carrying on a business' and *230 * * * salaries and other expenses incident to the operation are not deductible as having been paid or incurred in a trade or business." Commissioner v. Groetzinger, supra at 30. Instead, an investor's expenses are deductible under section 212 as incurred in the production of income. [11] Sec. 212; Whipple v. Commissioner, supra at 200; United States v. Gilmore, 372 U.S. 39, 45 (1963). In determining whether a taxpayer who manages his own investments is a trader, nonexclusive factors to consider are (1) the taxpayer's investment intent, (2) the nature of the income to be derived from the activity, and (3) the frequency, extent, and regularity of the taxpayer's securities transactions. Moller v. United States, supra at 813. *231 Thus, a taxpayer's activities constitute the trade or business of trading only where both of the following are true: (1) The taxpayer's trading is substantial. King v. Commissioner, 89 T.C. 445, 458-459 (1987); Paoli v. Commissioner, supra; Walker v. Commissioner, T.C. Memo. 1990-609. In this regard, sporadic trading will not constitute a trade or business. Commissioner v. Groetzinger, supra at 35; Paoli v. Commissioner, supra.
(2) The taxpayer seeks to catch the swings in the daily market movements, and to profit from these short-term changes, Moller v. United States, supra at 813; Purvis v. Commissioner, 530 F.2d 1332, 1334 (9th Cir. 1976), affg. T.C. Memo. 1974-164; Liang v. Commissioner, 23 T.C. 1040, 1043 (1955); Walker v. Commissioner, supra, rather than to profit from the long-term holding of investments, Estate of Yaeger v. Commissioner, supra at 33; *232 Paoli v. Commissioner, supra. In connection with this, courts look at whether the taxpayer's securities income is principally derived from the frequent sale of securities rather than from dividends, interest, or long-term appreciation. Moller v. United States, supra at 813; Purvis v. Commissioner, supra at 1334; King v. Commissioner, supra at 458-459; Liang v. Commissioner, supra at 1043. Mr. Mayer meets the first prong of this two-part test. In each year in issue, his trading was substantial, both in dollar amount and in number of trades. Thus, whether or not Mr. Mayer was in the trade or business of trading depends on whether he sought to capitalize on short-term swings in the market, or instead strove for long-term appreciation of his capital. Mr. Mayer admitted that his focus was long-term capital growth. This goal was further reflected in his letters of understanding with the money managers. The emphasis on capital growth and profit from resale indicates an investment-motivated activity. Estate *233 of Yaeger v. Commissioner, supra at 34. In addition to Mr. Mayer's goal of long-term appreciation, we look to the two fundamental criteria that distinguish traders from investors: The length of the holding period of the securities and the source of the profit. Id. at 33; see also Moller v. United States, supra at 813. These factors indicate that Mr. Mayer was an investor, not a trader. For the years in issue, the weighted average holding periods for securities sold in Mr. Mayer's managed accounts were 317 days in 1986, 439 days in 1987, and 415 days in 1988. For each of the years in issue, the percentage of stocks sold with holding periods of 30 days or less ranged from .01 percent to 5.41 percent. By contrast, the percentage of stocks sold with holding periods of 1 year or more ranged from 32.47 to 44.17 percent. Approximately two-thirds or more of petitioners' stocks sold during the years in issue were held more than 6 months. [12] The lengthy holding periods of petitioners' stocks, averaging approximately 1 year for stocks sold in Mr. Mayer's accounts, belie any effort to capitalize on daily or short-term swings in the market. *234 Compare Estate of Yaeger v. Commissioner, 889 F.2d at 34 (taxpayer was an investor, despite extremely high volume of transactions, where "most of his sales were of securities held for over a year" and he did not sell any security held less than 3 months) and Purvis v. Commissioner, supra at 1334 (taxpayer was mere investor where 31 of his 75 sales of securities were of stock held more than 6 months, and substantial number were admittedly held as investments or were held for periods exceeding 3 years) with Paoli v. Commissioner, supra (many of taxpayers' transactions involved securities held less than 1 day, and 78.49 percent of taxpayers' 1982 securities proceeds involved stocks held less than 31 days; however, taxpayers were mere investors where sales of stock were not regular and continuous) and Connelly v. Commissioner, T.C. Memo. 1982-644 (taxpayer was trader or dealer where all of his numerous securities transactions generated short-term capital gains and losses, and he reported no dividend income). In addition, the record indicates that in each *235 year 84 to 88 percent of petitioners' total securities income and 82 to 95 percent of the income from petitioners' managed accounts consisted of dividends, interest, and long-term capital gain, an indicium of investors, not traders. See, e.g., Moller v. United States, 721 F.2d at 815 (taxpayers who derived "the vast majority of their income in the form of dividends and interest * * * [and from] the long-term holding of securities" were mere investors); Estate of Yaeger v. Commissioner, supra at 34 (taxpayer who profited from dividends, interest, and capital growth from resale of securities held over 1 year was investor).
Although Mr. Mayer handled his securities investments in a businesslike manner, that fact is irrelevant *236 to our determination of whether he was a trader or a mere investor. See Higgins v. Commissioner, 312 U.S. at 213; Moller v. United States, supra at 814. In Higgins v. Commissioner, supra at 217, the taxpayer had substantial investments in real estate, stocks, and bonds. He devoted a considerable amount of time to oversight of his investments. Id. He maintained two offices from which he conducted his investment activities. In his New York office, the taxpayer employed an office manager, an assistant, an accountant, and a stenographer/clerk. Higgins v. Commissioner, 39 B.T.A. 1005, 1006 (1939), affd. 111 F.2d 795 (2d Cir. 1940), affd. 312 U.S. 212 (1941). The taxpayer employed an additional employee who worked in the Paris office. Id. Despite the taxpayer's businesslike conduct of his investment activities, the Supreme Court held that he was a mere investor, and his activity did not constitute a trade or business. Higgins v. Commissioner, 312 U.S. at 217. *237 We reiterate that even "full-time market activity in managing and preserving one's own estate is not embraced within the phrase 'carrying on a business'". Commissioner v. Groetzinger, 480 U.S. at 30; see also Wilson v. United States, 179 Ct. Cl. 725; 376 F.2d 280, 292-293 (1967); Beals v. Commissioner, T.C. Memo. 1987-171. Thus, we find that despite the scope and extent of his activity, Mr. Mayer was an investor, not a trader. [13] As such, he was not conducting a trade or business. Commissioner v. Groetzinger, supra at 30; Whipple v. Commissioner, 373 U.S. at 202; King v. Commissioner, 89 T.C. at 459; Paoli v. Commissioner, T.C. Memo. 1991-351. Petitioners argue that if they were investors and not traders, they are entitled to capitalize their securities-related expenses by adding such expenses to the cost basis of stocks purchased and to the sales expenses of stocks sold. Respondent argues that petitioners' expenses cannot be capitalized *238 and are deductible, if at all, under section 212. Petitioners bear the burden of proving what portion of their expenditures are nondeductible capital expenditures and what portion are deductible expenses. Rule 142(a); Estate of Boyd v. Commissioner, 76 T.C. 646, 658 (1981). Section 1.263(a)-2, Income Tax Regs., cited by petitioners, provides in part: The following paragraphs include examples of capital expenditures: * * *239 * (e) Commissions paid in purchasing securities. Commissions paid in selling securities are an offset against the selling price * * *.
Petitioners are correct that under this regulation, commissions paid in purchasing securities must be capitalized. See, e.g., Woodward v. Commissioner, 397 U.S. 572, 575-576 (1970). "Legal, brokerage, accounting, and similar costs incurred in the acquisition or disposition of property are capital expenditures." Id. at 576. Where a taxpayer incurs investment adviser expenses, courts look at the nature of the services performed by the adviser to determine whether these expenses must be capitalized. See, e.g., Honodel v. Commissioner, 76 T.C. 351, 365 (1981), affd. 722 F.2d 1462 (9th Cir. 1984); Cagle v. Commissioner, 63 T.C. 86, 96 (1974), affd. 539 F.2d 409 (5th Cir. 1976). Services performed in the acquisition process are capital in nature. Woodward v. Commissioner, supra at 575; Honodel v. Commissioner, supra at 365. *240 Thus, fees paid in connection with the acquisition of particular investments are capital in nature. Honodel v. Commissioner, 722 F.2d at 1466. On the other hand, fees paid for investment counsel and advice with respect to investments are deductible as an expense incurred in the production of income. Petitioners did not prove that they paid any commissions or acquisition-related expenses of a capital nature during the years in issue. Although petitioners submitted two exhibits purporting to allocate "transaction fees" to purchases and/or sales of securities, they provided no information on the breakdown of these transaction fees. It appears from the record that these transaction fees consisted in large part of general overhead rather than costs specifically allocable to individual purchases and sales. These expenses are not capitalizable under section 263. Secs. 1.212-1(g), 1.263(a)-2, Income Tax Regs. See generally Woodward v. Commissioner, supra at 575-576. Thus, petitioners did not meet their burden of proof on this issue and cannot capitalize their transaction costs. Respondent determined that petitioners' *241 treatment of their net capital gain derived from their investment activities in 1987 and 1988 as passive income was erroneous. Section 469(c) defines "passive activity" to mean an activity that involves the conduct of a trade or business, or the expenses of which are deductible under section 212, in which the taxpayer does not materially participate. Mr. Mayer's full-time work managing petitioners' investments constitutes "material participation". Sec. 469(h); sec. 1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988). In addition, petitioners' income from their securities investments constitutes "portfolio income", which is not included in the computation of passive activity gross income. Sec. 469(e)(1)(A). Portfolio income includes gains and losses, not derived in the ordinary course of a trade or business, that are attributable to the disposition of property held for investment. Sec. 469(e)(1)(A)(ii). Accordingly, petitioners' income from their investments was not passive income. To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. The first two pages of the notice of deficiency erroneously reflect a $ 225,225 deficiency for 1986.↩
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners presented no evidence that they managed the cash, stock, and bonds not managed by money managers. In addition to cash, stock, and bonds held in managed accounts or otherwise, petitioners also invested in venture capital transactions. The percentage of petitioners' total assets invested in venture capital activities was 45.61 percent on Dec. 31, 1986; 49.21 percent on Dec. 31, 1987; and 44.91 percent on Dec. 31, 1988.↩
3. In addition to investing in an investment fund, Mr. Mayer employed eight money managers. Their investment styles were: (1) Relative value. A relative value investor is one who believes that everything has an appropriate price and determines that price in order to decide if the investment is appropriate. (2) Investing in emerging industries. (3) Contrarian. A contrarian buys stocks that other people are not buying. This money manager generally held stocks from 1 to 3 years before selling them. (4) Investing in high-tech companies. (5) Investing in niche areas, that is, new trends in bolder businesses. (6) Buying particular stocks in other countries' stock markets. (7) Purchasing stock of large corporations traded on particular countries' stock markets that were doing well. (8) Investing in small capitalization stocks.↩
4. The money managers Mr. Mayer used required a minimum investment of $ 500,000 or more, depending on the manager. The managers were compensated based on a percentage of the value of the account every year, somewhere between three-fourths of 1 percent, and 2 percent.↩
5. Petitioners deposited their investment portfolio assets that were managed by four of their money managers in custodial banks. Five of the money managers also served as custodians over the portion of petitioners' investment portfolio assets they managed, in lieu of a bank.↩
6. Unlike the other money managers, who were told that petitioners did not need the money in the account for living purposes, Anderson and Hoagland, one of petitioners' money managers, was told to be prepared to send 20 percent of the account to petitioners within 5 days. During the years in issue, petitioners made regular monthly withdrawals of $ 25,000 from the Anderson and Hoagland account. During that period, petitioners also made withdrawals of principal from that account that were sizeable relative to the value of the account. This caused securities to be liquidated, which increased trading volume. The weighted average holding period for securities sold by Anderson and Hoagland for Mr. Mayer was 234 days in 1986, 186 days in 1987, and 358 days in 1988. The weighted average holding period in days is derived by using the following formula: SIGMA [(Holding period in days) X (Sales price)] / SIGMA (Sales price) SIGMA = mean (average).↩
7. Petitioners' gross proceeds from securities activities were the following amounts for the following years: ↩
Year
Amount
1986
$ 16,636,674
1987
18,506,218
1988
14,547,758
8. See supra↩ note 6 for the formula used to derive weighted average holding period in days.
9. These numbers include flow-through income, gain, and loss from partnerships. During the years in issue, petitioners received the following amounts of long-term capital gain, dividends, and interest from their managed accounts, which constituted the following percentages of their total income from managed accounts for that year: Total Net
Percent
Net
Long-Term
Total
of Total
Long-Term
Capital
Income From
Income
Gains,
From
Capital
Dividends &
Managed
Managed
Year
Gains
Dividends
Interest
Interest
Accounts Total income from managed accounts equals the sum of net long-term capital gains, dividends, interest, and net short-term capital gains from petitioners' managed accounts.
[1]
Accounts This column reflects the percentage of total income from managed accounts that is composed of long-term capital gain, dividends, and interest.
[2]↩
1986
$ 2,634,960
$ 405,879
$ 269,082
$ 3,309,921
$ 4,029,906
82.13
1987
3,639,765
492,044
363,300
4,495,109
4,686,724
95.91
1988
434,720
671,118
346,900
1,452,738
1,644,915
88.32
1. Total securities income equals the sum of net long-term capital gains (or losses), dividends, interest, and net short-term capital gains (or losses).↩
2. This column reflects the percentage of total income from managed accounts that is composed of long-term capital gains (or losses), dividends, and interest.↩
10. Petitioners have not seriously contended that Mrs. Mayer was in the trade or business of trading securities. Based on the entire record in this case, we agree with respondent that she was not.↩
11. In contrast to trade or business expenses, a taxpayer's investment-related expenses that are deductible under sec. 212 are subject to a limitation under sec. 67(a), and do not reduce alternative minimum taxable income.↩
12. In 1986, 70.66 percent of petitioners' stocks were held longer than 6 months. In 1987, 65.42 of petitioners' stocks were held longer than 6 months. In 1988, 77.56 percent of petitioners' stocks were held longer than 6 months.↩
13. Because of our decision on this issue, we do not reach the issue of whether the mere fact that petitioners ceded full discretion over their accounts, and engaged in no trading in such accounts themselves, precludes them from being classified as "traders". See, e.g, Snyder v. Commissioner, 295 U.S. 134, 139 (1935); Moller v. United States, 721 F.2d 810, 813 (Fed. Cir. 1983); Levin v. United States, 220 Ct. Cl. 197; 597 F.2d 760, 765↩ (1979).