T.C. Memo. 2013-199

UNITED STATES TAX COURT

THOMAS ARTHUR ENDICOTT AND MELINDA JANE ENDICOTT,
Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6312-11.                    Filed August 28, 2013.

Thomas Arthur Endicott and Melinda Jane Endicott, pro se.

Timothy S. Sinnott, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge:  Respondent determined deficiencies in petitioners' Federal

income tax of $52,705, $9,272, and $9,184 for the taxable years 2006, 2007, and

2008 (years at issue), respectively, and accuracy-related penalties under section

[*2] 6662(a)[1] of $10,541, $1,854.40, and $1,836.80 for the taxable years 2006, 2007, and 2008, respectively. The issues for decision are: (1) whether Thomas Endicott (petitioner) was a trader in securities during the years at issue; and (2) whether petitioners are liable for accuracy-related penalties under section 6662(a).[2]

If we find that petitioner was not a trader during the years at issue, the investment expenses that he claimed as trade or business expenses on Schedules C, Profit or Loss From Business, of petitioners' tax returns will be disallowed in full as Schedule C expenses.[3] The parties agree that if we find that petitioner is not a trader, then: (1) petitioners will not be entitled to a $4,000 claimed deduction for tuition and fees for the taxable year 2006; (2) petitioners' Schedules A, Itemized Deductions, will be decreased by $9,976 for the taxable year 2006 and

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]We note that respondent does not dispute petitioners' treatment of income and losses from the purchase and sale of stocks and call options.

[3]A trader's expenses are deducted in determining adjusted gross income. See Kay v. Commissioner, T.C. Memo. 2011-159, 2011 Tax Ct. Memo LEXIS 156, at *6. An investor's expenses are deducted under sec. 212 as itemized deductions, and, as pertinent to petitioners, the deduction of investment interest is limited by sec. 163(d). See Arberg v. Commissioner, T.C. Memo. 2007-244, 2007 Tax Ct. Memo LEXIS 253, at *33.

[*3] increased by $5,351 and $6,976 for the taxable years 2007 and 2008, respectively; (3) petitioners' claimed exemptions for the taxable year 2006 will be reduced by $2,992; (4) petitioners' Social Security benefits for the taxable year 2008 will be taxable in the amount of $9,067; (5) petitioners will be liable for a $5,607 alternative minimum tax for the taxable year 2006; (6) petitioners will be liable for self-employment taxes of $17,699, $9,272, and $9,184 for the taxable years 2006, 2007, and 2008, respectively; and (7) petitioners will be entitled to deductions equal to one-half of the self-employment taxes of $8,850, $4,636, and $4,592 for the taxable years 2006, 2007, and 2008, respectively.[4]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

At the time the petition was filed, petitioners resided in Indiana.

Petitioner had been the president of Duffy Tool & Stamping until he retired in 2002. In 2006 petitioner began a new endeavor, purchasing and selling stocks and call options.

---

[4]The notice of deficiency incorporated these adjustments in determining petitioners' deficiencies for the years at issue.

[*4]  Petitioner's primary strategy was to purchase shares of stock and then sell call options[5] on the underlying stock.  Petitioner explained that he did not purchase stocks without selling call options and that he did not sell call options without owning the underlying stock.  Petitioner's goal was to earn a profit from the premiums received from selling call options against a corresponding quantity of underlying stock that he held.  Petitioner held the underlying stock as a means to reduce his risk of loss in the event the purchaser of the call option exercised the option.

Petitioner typically sold call options with a term between one and five months.  Petitioner's goal was for the options to expire; thus, the entire amount of the premium received would be a profit.  Petitioner did not trade options on a daily basis due to the high commission costs associated with selling and purchasing call options.  If the options expired, petitioner usually would continue to hold the

---

[5]In a call option transaction the seller of the call option promises to deliver to the purchaser of the call option a certain number of shares in the underlying stock at a certain price (exercise price).  The purchaser must exercise his right to purchase the underlying stock by a certain date (expiration date).  If the purchaser does not exercise the option, then the option expires and the seller does not deliver the underlying stock.  As consideration for entering into the call option transaction, the purchaser pays a premium to the seller.  The premium received by the seller is a certain amount of money per share of the underlying stock covered by the option agreement.  See Laureys v. Commissioner, 92 T.C. 101 (1989), for a general discussion of options.

[*5] underlying stock and sell additional call options with a new term. If the options were exercised, petitioner would deliver the underlying stock to the purchaser of the call option. If petitioner felt it was no longer profitable to maintain an option position, he would exit out of the position by purchasing a call option similar to the one he sold.[6] The record demonstrates that some of petitioner's call options expired, some were exercised by the purchaser of the option, and some petitioner exited out of before the expiration date.

It is helpful to provide an example to illustrate petitioner's strategy. On February 23, 2006, petitioner purchased 20,000 shares of stock in SLM Corp. (SLM). On February 21, 2006, petitioner sold call options on 20,000 shares of SLM stock with an expiration date of April 1, 2006.[7] The options expired on April 1, 2006. On May 1, 2006, petitioner sold call options with an expiration date of July 1, 2006, and exited out of the position on June 29, 2006. On June 29, 2006, petitioner sold call options with an expiration date of October 21, 2006, and exited out of the position on September 22, 2006. On September 22, 2006,

_____

[6]Thus, petitioner's liability to deliver the underlying stock from the call option he sold would be netted out by his right to purchase the underlying stock from the call option he purchased.

[7]All of the call options sold in this discussion covered 20,000 shares of SLM stock.

[*6] petitioner sold call options with an expiration date of January 20, 2007 and exited out of the position on January 4, 2007.  On January 4, 2007, petitioner sold call options with an expiration date of April 21, 2007, and exited out of the position on March 6 and 15, 2007.  On March 6 and 15, 2007, petitioner sold call options with an expiration date of July 21, 2007, which expired on that date.  Petitioner earned net premiums of $166,060 from selling these call options.[8]  This amount was reported as a short-term capital gain.  During this period SLM paid a dividend to shareholders on five occasions.  Petitioner did not offer into evidence all of the account statements from his brokers for the years at issue.  However, by multiplying the dividend paid per share of SLM stock by the 20,000 shares he held, we can determine that petitioner received approximately $24,400 of dividends.  On July 20, 2007, petitioner sold the 20,000 shares of SLM stock, giving him a long-term capital loss of $212,717.

As a result of employing this strategy, petitioner could hold the underlying stock for a period of time that was much longer than the term of the individual call options.[9]  During the years at issue petitioner held his stocks on average for 35

---

[8]This amount is reduced by the amounts paid to purchase call options to exit out of his positions.

[9]For example, the longest term for which petitioner maintained a call option
(continued...)

[*7] days. However, petitioner held a significant number of stocks for well over a year and held some stocks for over four years. As a result of holding the underlying stock, petitioner received dividends of $51,125 in 2006, $39,553 in 2007, and $29,565 in 2008.

Petitioner would monitor his portfolio to ensure that the number of shares covered by the call options was the exact number of shares that he held in the underlying stock. He would also monitor the market price of the underlying stock because if it precipitously dropped, he would sell the underlying stock and purchase a call option, equivalent to the one he earlier sold, to close out of his position. Although petitioner did not execute trades on every business day, he testified that he devoted every business day to monitoring his portfolio as well as performing research to find new positions to take once his current positions were closed.

At different times throughout the years at issue petitioner had accounts with the following brokers: Brown Co., First Alliance Asset Management, Inc., and E*Trade Securities. The brokers allowed petitioner to use margin for his stock purchases. The process of using margin entails the broker lending money to

---

[9](...continued)
position on SLM was for 4-1/2 months. However, petitioner held the 20,000 shares of SLM stock for 17 months.

[*8] petitioner for him to purchase additional shares of stock. Petitioner testified that he usually used 100% margin for his purchases of stock. This meant that if he bought $100,000 of stock with his money in the brokerage account he would borrow $100,000 from the broker so he could purchase an additional $100,000 of stock to give him a total purchase of $200,000 of stock. By using 100% margin, petitioner would double the number of shares of underlying stock that he could purchase, which allowed him to double the number of call options he sold, thereby doubling the amount of premiums he received. The brokers would charge petitioner interest on the amount he borrowed. The brokers charged petitioner interest of $312,888 in 2006, $312,873 in 2007, and $69,058 in 2008.

During the 2006 taxable year petitioner executed 204 trades[10] on 75 days. During the 2007 taxable year petitioner executed 303 trades on 99 days. In October 2008 petitioner changed his trading strategy. Instead of purchasing stock and selling call options, petitioner began purchasing and selling shares of the

---

[10]The term "executed trade" refers to either a purchase of stock, sale of stock, sale of a call option, or purchase of a call option. A call option that expires is not counted as an executed trade because an expired call option does not require the seller to enter into a transaction with a broker. For example, if petitioner purchased stock, sold a call option that expired unexercised, and subsequently sold the stock, then petitioner would have executed three trades.

[*9] SPDR S&P 500 ETF Trust.[11]   During the 2008 taxable year petitioner executed 1,543 trades on 112 days.

For each of his 2006, 2007, and 2008 Federal income tax returns, petitioner attached two separate Schedules C.  On the first Schedule C petitioner listed as his principal business "other financial investments activities" (Financial Schedule C) and the other Schedule C as "consulting" (Consulting Schedule C).  Petitioner reported the expenses associated with his trading activities on Financial Schedules C of his Federal income tax returns for 2006, 2007, and 2008.  Petitioner reported expenses of $318,620 for 2006, $318,687 for 2007, and $77,747 for 2008.  The interest petitioner was charged for using margin was included in these amounts and comprised almost the entire balance.[12]  The gains and losses from the sale of stocks and options were reported on Schedules D, Capital Gains and Losses.  To summarize, petitioner reported the gains and losses from purchasing and selling

---

[11]The SPDR S&P 500 ETF Trust is an exchange-traded fund that seeks to provide the investment results that generally correspond to the performance of the Standard & Poor's 500 Index.  Shares of the SPDR S&P 500 ETF Trust are sold on the New York Stock Exchange.

[12]Approximately 98% of petitioner's reported total expenses of $318,620 on Financial Schedule C for 2006 consisted of interest he was charged for using margin ($312,888).  The percentage was similar for the 2007 taxable year, and decreased to 88% for the 2008 taxable year.

[*10] stocks and options on Schedules D but reported the expenses associated with this activity on Financial Schedules C.

Petitioner reported $224,700 of income on Consulting Schedules C for 2006 and $65,000 of income for 2007 and 2008. Petitioner testified that the income was from a noncompete agreement with Duffy Tool & Stamping and not for services provided as a consultant. Petitioner did not offer the noncompete agreement into evidence.

Petitioners retained the services of a tax return preparer for their Federal income tax returns for the years at issue.

On December 14, 2010, respondent issued to petitioners a notice of deficiency for the years at issue. Petitioners filed a petition disputing the determinations in the notice of deficiency.

OPINION

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving that the determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

**[*11]** <u>Trader or Investor</u>

"In general, for Federal tax purposes, a person who purchases and sells securities falls into one of three distinct categories:  dealer, trader, or investor." <u>Kay v. Commissioner</u>, T.C. Memo. 2011-159, 2011 Tax Ct. Memo LEXIS 156, at *5 (citing <u>King v. Commissioner</u>, 89 T.C. 445, 458-459 (1987)).  "Traders are engaged in the trade or business of selling securities for their own account."  <u>Kay v. Commissioner</u>, 2011 Tax Ct. Memo LEXIS 156, at *6 (citing <u>King v. Commissioner</u>, 89 T.C. at 457-458).  A "trader's profits are derived through the very acts of trading -- direct management of purchasing and selling."  <u>Levin v. United States</u>, 220 Ct. Cl. 197, 205 (1979); <u>see</u> <u>Estate of Yaeger v. Commissioner</u>, 889 F.2d 29, 33 (2d Cir. 1989), <u>aff'g</u> T.C. Memo. 1988-264.  Investors purchase and sell securities for their own account, but they are not considered to be in the trade or business of selling securities.  <u>See</u> <u>Kay v. Commissioner</u>, 2011 Tax Ct. Memo LEXIS 156, at *6; <u>Arberg v. Commissioner</u>, T.C. Memo. 2007-244, 2007 Tax Ct. Memo LEXIS 253, at *33.  "Investors derive profit from the interest, dividends, and capital appreciation of securities."  <u>Estate of Yaeger v. Commissioner</u>, 889 F.2d at 33.  This Court has held that taxpayers who purchase and sell options also fall into one of the three categories of dealer, trader, or investor.  <u>See</u> <u>Holsinger v. Commissioner</u>, T.C. Memo. 2008-191, 2008 Tax Ct.

**[*12]** Memo LEXIS 187 (taxpayer who purchased and sold stocks and options was an investor); see also Laureys v. Commissioner, 92 T.C. 101, 134-137 (1989) (taxpayer who purchased and sold options was a trader).

A trader's expenses are deducted in determining adjusted gross income. See Kay v. Commissioner, 2011 Tax Ct. Memo LEXIS 156, at *6. An investor's expenses are deducted under section 212 as itemized deductions, and deduction of investment interest is limited by section 163(d). See Arberg v. Commissioner, 2007 Tax Ct. Memo LEXIS 253, at *33. Furthermore, an investor's expenses do not reduce alternative minimum taxable income. See Mayer v. Commissioner, T.C. Memo. 1994-209, 1994 Tax Ct. Memo LEXIS 216, at *15. As a result, it is generally more favorable for a taxpayer to be classified as a trader rather than an investor.

Petitioner argues that he is a trader.[13] Respondent contends that petitioner is an investor. Neither party argues that petitioner is a dealer.

---

[13]Petitioner repeatedly cites Topic 429, Traders in Securities (Information for Form 1040 Filers), a publication electronically published by the Commissioner, to support his argument that he is a trader. We note that informal IRS publications are not authoritative sources of Federal tax law. See Zimmerman v. Commissioner, 71 T.C. 367, 371 (1978), aff'd without published opinion, 614 F.2d 1294 (2d Cir. 1979).

**[*13]** The Code does not define the term "trade or business" for purposes of section 162.  See Commissioner v. Groetzinger, 480 U.S. 23, 27 (1987); Mayer v. Commissioner, 1994 Tax Ct. Memo LEXIS 216, at *13.  Whether a taxpayer's activities constitute a trade or business is a question of fact.  See Higgins v. Commissioner, 312 U.S. 212, 217 (1941); Holsinger v. Commissioner, 2008 Tax Ct. Memo LEXIS 187, at *5-*6.

In determining whether a taxpayer is a trader, nonexclusive factors to consider are:  (1) the taxpayer's intent, (2) the nature of the income to be derived from the activity, and (3) the frequency, extent, and regularity of the taxpayer's transactions.  See Moller v. United States, 721 F.2d 810, 813 (Fed. Cir. 1983); Ball v. Commissioner, T.C. Memo. 2000-245, 2000 Tax Ct. Memo LEXIS 289, at *4.  For a taxpayer to be a trader, the trading activity must be substantial, which means "'frequent, regular, and continuous enough to constitute a trade or business'".  Ball v. Commissioner, 2000 Tax Ct. Memo LEXIS 289, at *4 (quoting Hart v. Commissioner, T.C. Memo. 1997-11, 1997 Tax Ct. Memo LEXIS 10, at *8).  A taxpayer's activities constitute a trade or business where both of the following requirements are met:  (1) the taxpayer's trading is substantial, and (2) the taxpayer seeks to catch the swings in the daily market movements and to profit from these short-term changes rather than to profit from the long-term holding of

[*14] investments.  See Holsinger v. Commissioner, 2008 Tax Ct. Memo LEXIS 187, at *7; Mayer v. Commissioner, 1994 Tax Ct. Memo LEXIS 216, at *16.

Trading Was Not Substantial

For a taxpayer to be a trader, the trading activity must be substantial.  See Ball v. Commissioner, 2000 Tax Ct. Memo LEXIS 289, at *4.  In determining whether a taxpayer's trading activity is substantial, the Court considers the number of executed trades in a year, the amount of money involved in those trades, and the number of days that trades were executed.  See Kay v. Commissioner, 2011 Tax Ct. Memo LEXIS 156, at *7-*9; Holsinger v. Commissioner, 2008 Tax Ct. Memo LEXIS 187, at *7-*8.

Petitioner executed 204 trades during 2006, 303 trades during 2007, and 1,543 trades during 2008.  We have held that trading was not substantial when the number of executed trades exceeded the number of trades petitioner executed in 2006 and 2007.  See Kay v. Commissioner, 2011 Tax Ct. Memo LEXIS 156, at *9-*10 (313 executed trades was not substantial); Holsinger v. Commissioner, 2008 Tax Ct. Memo LEXIS 187, at *8 (372 executed trades was not substantial); Cameron v. Commissioner, T.C. Memo. 2007-260, 2007 Tax Ct. Memo LEXIS 265, at *9-*10 (212 executed trades was not substantial).  We have held that trading is substantial when a taxpayer executed 1,136 trades in a year.  See Mayer

[*15] v. Commissioner, 1994 Tax Ct. Memo LEXIS 216, at *11, *17. We find that the number of trades petitioner executed was not substantial for the 2006 and 2007 taxable years but was substantial for the 2008 taxable year.

Petitioner made purchases and sales of approximately $7 million during 2006, $15 million during 2007, and $16 million during 2008. These amounts are considerable. However, "managing a large amount of money is not conclusive as to whether petitioner's trading activity amounted to a trade or business." Kay v. Commissioner, 2011 Tax Ct. Memo LEXIS 156, at *10 (citing Moller, 721 F.2d at 814).

"In the cases in which taxpayers have been held to be in the business of trading in securities for their own account, the number of their transactions indicated that they were engaged in market transactions on an almost daily basis." Moller, 721 F.2d at 813-814; see also Chen v. Commissioner, T.C. Memo. 2004-132, 2004 Tax Ct. Memo LEXIS 131, at *11-*12 (traders are "engaged in market transactions almost daily for a substantial and continuous period, generally exceeding a single taxable year"). In Holsinger we held that executing trades on 110 days was not frequent, continuous, or regular enough to constitute a trade or business. See Holsinger v. Commissioner, 2008 Tax Ct. Memo LEXIS 187, at *8; see also Kay v. Commissioner, 2011 Tax Ct. Memo LEXIS 156, at *2, *8-*10

**[\*16]** (trading on 73 days was not frequent). Petitioner executed trades on 75 days in 2006, 99 days in 2007, and 112 days in 2008. In none of the years at issue did petitioner execute trades on "an almost daily basis" or even every other day. We note that during the 36 months in the years at issue, there were ten months in which petitioner executed three or fewer trades. Seven of these low frequency trading months occurred in 2006, one month occurred in 2007, and two months occurred in 2008. Included in these ten months were two months in which petitioner executed only one trade. This indicates that petitioner's trading activity[14] was not regular and continuous. See Paoli v. Commissioner, T.C. Memo. 1991-351, 1991 Tax Ct. Memo LEXIS 400, at \*19-\*22. Accordingly, we find that the number of days petitioner executed trades was not frequent, continuous, or regular enough to constitute a trade or business.

We review the number of days a taxpayer executed trades because one of the requirements for trading to be substantial is that a taxpayer must purchase and sell securities with the frequency, regularity, and continuity to constitute a trade or business. See Kay v. Commissioner, 2011 Tax Ct. Memo LEXIS 156, at \*7; Ball v. Commissioner, 2000 Tax Ct. Memo LEXIS 289, at \*4. We will refer to this as

---

[14]We use the term "trading activity" to refer to petitioner's purchase and sale of options and stocks. By using this term we do not imply that petitioner's activity was that of a trader.

[*17] the frequency requirement. Petitioner argues that options are unique and different from stocks and that in determining if a taxpayer meets the frequency requirement the Court should add the number of days that the taxpayer maintained an option position to the number of days that the taxpayer executed trades.[15] We decline to do so.

First, while options are different from stocks, they are similar in that both can be purchased and sold on a daily basis on exchanges. Petitioner testified that due to the high commission costs for options it was not profitable for him to purchase and sell options on a daily basis. Petitioner's inability to profit from the frequent purchasing and selling of options is not a reason to relieve petitioner from the frequency requirement. Furthermore, we note that petitioner's proposed rule leads to the opposite result intended by the frequency requirement. Using petitioner's rationale, a taxpayer that closed out of an option position after maintaining it for one day would be treated as trading on one day. A taxpayer that closed out of an option position maintained for 100 days would be treated as trading on 100 days. The longer a taxpayer holds an option position, the more it

---

[15]The period that petitioner maintained an option position begins with the date that the call option was sold and ends on the date that the option was exercised, exited, or expired.

[*18] resembles a long-term investment. Thus, petitioner's proposed rule would result in long-term option investors' being classified as highly frequent option traders.

For the 2006 and 2007 taxable years we have found that the number of executed trades was not substantial and the number of days that petitioner executed trades did not evidence the frequency, continuity, and regularity to constitute a trade or business. As a result, petitioner's trading was not substantial for the 2006 and 2007 taxable years. For the 2008 taxable year we have found that the number of executed trades was substantial. However, we have also found that the number of days petitioner executed trades did not evidence the frequency, continuity, and regularity necessary to constitute a trade or business. Accordingly, petitioner's trading was not substantial for the 2008 taxable year.

Swings in the Daily Market

For a taxpayer to be a trader he must seek to catch the swings in the daily market movements and to profit from these short-term changes. Kay v. Commissioner, 2011 Tax Ct. Memo LEXIS 156, at *7 (citing Mayer v. Commissioner, 1994 Tax Ct. Memo LEXIS 216, at *16). To determine if a taxpayer seeks to catch the swings in the daily market the Court reviews the length of the holding periods of the securities. See Estate of Yaeger v. Commissioner,

**[\*19]** 889 F.2d at 33; <u>Mayer v. Commissioner</u>, 1994 Tax Ct. Memo LEXIS 216, at \*18. In <u>Holsinger v. Commissioner</u>, 2008 Tax Ct. Memo LEXIS 187, at \*9, we held that the taxpayer did not seek to catch the swings in the daily market because a significant amount of his stock was held for more than 31 days. Similarly, in <u>Kay v. Commissioner</u>, 2011 Tax Ct. Memo LEXIS 156, at \*10-\*11, we held that the taxpayer was not a trader because most of his stocks were held for over 30 days. During the years at issue petitioner held his stocks on average for 35 days, with some stocks being held for over four years. Petitioner's average holding period of 35 days demonstrates that he was not attempting to catch and profit from the swings in the daily market.

On his respective Schedules D, petitioner reported long-term capital losses of $122,329 for 2006, $393,037 for 2007, and $612,979 for 2008.[16] A loss from the sale of a capital asset that is held for more than one year is reported as a long-term capital loss. <u>See</u> sec. 1222(4). Therefore, petitioner's substantial long-term capital losses are from stocks that he held for more than one year. Holding periods of one year "belie any effort to capitalize on daily or short-term swings in the market." <u>Mayer v. Commissioner</u>, 1994 Tax Ct. Memo LEXIS 216, at \*18. We

---

[16]We excluded the long-term capital loss carryover from these amounts so as to present the long-term capital loss attributable to petitioner's trading activities for each year.

[*20] specifically note that for the 2008 taxable year petitioner's long-term capital loss from the sale of stocks held for more than one year exceeded his short-term capital loss from the sale of stocks held less than one year and from options maintained for less than one year.

Petitioner argues that his primary goal was to profit from the sale of short-term options;[17] therefore, the holding period of his stocks is not indicative of his intention to catch and profit from the swings in the daily market. As a result, we construe petitioner's argument to be that the Court should not consider his average holding period of stocks and, presumably, should consider only the average period that he maintained option positions. We disagree for the following reasons.

First, owning the underlying stock was an integral part of petitioner's activity. Petitioner testified that selling call options without owning the underlying stock could expose him to unlimited losses. As a result, petitioner did not sell call options unless he owned the underlying stock. Second, almost all of the expenses that petitioner incurred were interest charged for using margin to purchase stock. It would make no sense to exclude stock from the average holding period when the purchase of stock was the dominant cause of incurring expenses. Finally, even if we were to consider only the average period in which petitioner

---

[17]As previously stated petitioner's strategy changed in October 2008.

**[\*21]** maintained his option positions, we would still come to the conclusion that petitioner was not seeking to catch the swings in the daily market. The record demonstrates that petitioner usually maintained his option positions for a period between one and five months. Maintaining option positions for a period of between one and five months is not indicative of seeking to catch and profit from the swings in the daily market.

On the basis of petitioner's average holding period of his stocks and the periods he maintained option positions we find that petitioner was not seeking to catch and profit from the swings in the daily market.

Dividend Income

Petitioner received dividends of $51,125 in 2006, $39,553 in 2007, and $29,565 in 2008. The dividends received by petitioner from his holdings of stock are in the nature of an investor activity. See Estate of Yaeger v. Commissioner, 889 F.2d at 33 (investors derive profits from dividends); Liang v. Commissioner, 23 T.C. 1040, 1043 (1955).

Other Income

Generally, a taxpayer engaged in a substantial trading activity will rely on that income as his or her sole or primary source of income. See Kay v. Commissioner, 2011 Tax Ct. Memo LEXIS 156, at \*9; Paoli v. Commissioner,

**[*22]** 1991 Tax Ct. Memo LEXIS 400, at *23. On his respective Consulting Schedules C petitioner reported income of $224,700 for the 2006 taxable year and $65,000 for the 2007 and 2008 taxable years, whereas petitioner's purchase and sale of stocks and options produced a net loss for the 2007 and 2008 taxable years.

Conclusion

For the years at issue we find that petitioner's trading activity was not substantial and he was not seeking to catch and profit from the swings in the daily market. As a result, petitioner's trading activity did not constitute a trade or business. See Kay v. Commissioner, 2011 Tax Ct. Memo LEXIS 156, at *7. Accordingly, we find that petitioner was an investor and not a trader for the years at issue. This conclusion is buttressed by the substantial amount of dividend and other income petitioner received during the years at issue.

Petitioners claimed investment expenses on Financial Schedules C of $318,620, $318,687, and $77,747 for the taxable years 2006, 2007, and 2008, respectively. As a result of finding that petitioner was an investor for the years at issue, the investment expenses that petitioner claimed on Financial Schedules C for the years at issue are disallowed in full as Schedule C expenses.

**[*23]** <u>Accuracy-Related Penalty</u>

Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty on any portion of an underpayment attributable to a substantial understatement of income tax. Section 7491(c) provides that the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose the penalty. <u>See</u> <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001). Once the Commissioner meets his burden of production, however, the burden of proof remains with the taxpayer, including the burden of proving that the penalty is inappropriate because of reasonable cause under section 6664. <u>See</u> Rule 142(a); <u>Higbee v. Commissioner</u>, 116 T.C. at 446-447.

For individuals there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000. Sec. 6662(d)(1)(A). Petitioners' Federal income tax returns for the years at issue reported zero taxable income and, therefore, zero tax owed. Petitioners' deficiencies in income tax are $52,705, $9,272, and $9,184 for the taxable years 2006, 2007, and 2008, respectively. The understatements of income tax on petitioners' joint Federal income tax returns for the years at issue are substantial.

[*24] Consequently, we conclude that respondent has met his burden of production with respect to petitioners' substantial understatements of income tax.

Reasonable Cause

Section 6664(c)(1) provides that the penalty under section 6662(a) shall not apply to any portion of an underpayment if it is shown that there was reasonable cause for the taxpayer's position and that the taxpayer acted in good faith with respect to that portion. See Higbee v. Commissioner, 116 T.C. at 448. The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Petitioners have the burden of proving that the penalty is inappropriate because of reasonable cause under section 6664. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447.

"Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). The good-faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. Id. (citing United States v. Boyle, 469 U.S. 241 (1985)); sec. 1.6664-4(b), Income Tax Regs. Whether a

[*25] taxpayer relies on the advice and whether such reliance is reasonable hinge on the facts and circumstances of the case and the law that applies to those facts and circumstances. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98; sec. 1.6664-4(c)(1), Income Tax Regs. For reliance to be reasonable, "the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.

Petitioners' Federal income tax returns for the years at issue were prepared by a tax return preparer. Petitioners did not call the tax return preparer as a witness. Furthermore, petitioners did not establish that the tax return preparer was a competent professional with sufficient expertise to justify reliance. As a result, petitioners have not proven reasonable cause by good-faith reliance on the advice of a professional.

Substantial Authority

The amount of an understatement is reduced by that portion of the understatement which is attributable to the tax treatment of any item by the

[*26] taxpayer if there is or was substantial authority for such treatment. Sec. 6662(d)(2)(B)(i). "In evaluating whether a taxpayer's position regarding treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions." Antonides v. Commissioner, 91 T.C. 686, 702 (1988), aff'd, 893 F.2d 656 (4th Cir. 1990); see also sec. 1.6662-4(d)(3)(i), Income Tax Regs. The substantial authority standard is objective and, therefore, it is not relevant in determining whether the taxpayer believed substantial authority existed. Sec. 1.6662-4(d)(3)(i), Income Tax Regs.

As discussed earlier, the weight of authorities clearly supports the conclusion that petitioner's trading activity was that of an investor, not a trader. Furthermore, in Kay v. Commissioner, 2011 Tax Ct. Memo LEXIS 156, at *12-*14, we held that the section 6662(a) accuracy-related penalty was appropriate for a taxpayer whose trading activity was similar to that of petitioner. To reach his conclusion that he is a trader, petitioner asks the Court to create a novel exception to the established rules articulated in prior cases for taxpayers who purchase and sell options. Petitioner's proposed exception departs from prior caselaw, and we declined to adopt it. We therefore conclude that there was not substantial authority supporting petitioner's position that he was a trader.

[*27] Accordingly, we hold that petitioners are liable for the accuracy-related penalties under section 6662(a) for their underpayments of tax for the years at issue.

## Conclusion

We have held that petitioner was not a trader during the years at issue. Therefore, the expenses claimed on petitioners' Financial Schedules C for the years at issue are disallowed in full as Schedule C expenses. As a result, the adjustments to petitioners' Federal income tax returns for the years at issue, described supra pp. 2-3, are necessary. Petitioners are also liable for the section 6662(a) accuracy-related penalty for the years at issue.

In reaching our decision, we have considered all arguments made by the parties. To the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

Decision will be entered for respondent.